Argued and submitted June 7, judgment of conviction and sentence of death reversed and remanded to trial court for new trial September 21, 1988

## STATE OF OREGON,
*Respondent,*

*v.*

## JAMES MICHAEL ISOM,
*Appellant.*

## (TC C86-05-32246; SC S33725)

761 P2d 524

John P. Daugirda, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief were Gary D. Babcock, Public Defender, and Stephen J. Williams, Deputy Public Defender, Salem.

Timothy A. Sylwester, Assistant Attorney General, Salem, argued the cause for respondent. With him on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Jonathan H. Fussner, Brenda J. Peterson and Leslie J. Westphal, Assistant Attorneys General, Salem.

LENT, J.

Gillette, J., concurred and filed an opinion.

**LENT, J.**

Defendant was convicted of aggravated murder and was sentenced to death. The case is before us for review pursuant to ORS 163.150(1)(f), which provides:

"The judgment of conviction [of aggravated murder] and sentence of death shall be subject to automatic and direct review by the Supreme Court. * * *"

The dispositive issue is whether Article I, section 12, of the Oregon Constitution precludes the state from impeaching defendant's trial testimony with prior inconsistent statements elicited by police officers after defendant had told the officers that he did not wish to talk to them and that he wanted a lawyer.[1] We hold that use of the statements is precluded and that the trial court erred in admitting them for impeachment purposes. Because the error affected a substantial right of defendant, OEC 103(1), we reverse his conviction and remand for a new trial.

Defendant was indicted for aggravated murder. The indictment charged that, while an escapee from a correctional facility, defendant "did unlawfully and intentionally" cause the death of Barbara Ann Maher. *See* ORS 163.095(2)(f). He was found guilty and, after the jury had answered the three questions specified in ORS 163.150(1)(b) in the affirmative, was sentenced to death.

On direct examination at his trial, defendant testified to the following. He met Maher in a Portland bar and, at her suggestion, went with her to his motel room to continue drinking. When they arrived, he became ill from alcohol intoxication and spent several minutes in the bathroom. When he emerged from the bathroom, Maher and a man that he did not recognize attempted to rob him. The man grabbed defendant's left hand, and Maher grabbed his right front pocket. Defendant withdrew a knife from his pocket. He used his right hand, which held the knife, to drive Maher away and then broke free from the man's grip. The man fled. Defendant then saw that Maher was unconscious and bleeding. He carried her into the bathroom, where he discovered that she had been stabbed and

---

[1] Article I, section 12, of the Oregon Constitution provides, in part: "No person shall * * * be compelled in any criminal prosecution to testify against himself."

was dead. Unable to bring himself to inform the police, he placed her body in the bathtub and left the room. He returned the next morning, expecting to find the police at his room, but, not finding them there, he checked out of the motel. Approximately two hours later, he was arrested at a nearby restaurant after Maher's body had been discovered by a motel maid.

■ On cross-examination, the state sought to impeach defendant's testimony with statements that he had made to two detectives while in jail shortly after his arrest. Defendant's counsel objected to questions regarding these statements made by defendant to the police officers, which the state had conceded in a pretrial hearing were inadmissible in its case in chief. The objection was overruled. Thereupon, in response to the cross-examination, defendant denied telling the detectives that he deserved "the maximum" for killing Maher. He admitted that he had not told them that he had been attacked by Maher and the unidentified man but explained that he had wanted to consult with a lawyer before discussing the matter with the police. The colloquy appears in the transcript as follows:

"Q. Well, did you have a conversation on May 17th over in the Justice Center with Detective Findling and Detective Nelson?

"A. I most certainly did.

"Q. Okay. And at that time, do you recall that Detective Findling told you that anything you said couldn't be used in direct evidence against you, but that it could be used if you took the witness stand? Do you remember that?

"A. No."

The prosecutor then asked the witness:

"Q. So if he said — if he said that he said that to you, he either — he would either be lying or he had just been mistaken; is that correct?"

With this question the prosecutor violated a basic rule of evidence that no witness may pass upon the credibility of another witness unless authorized by the Oregon Evidence Code.

The prosecutor continued to engage in the same type of impermissible cross-examination and then proceeded as follows:

"Q. Okay. * * * Now, during this entire conversation that you had with Detective Findling, isn't it a fact that you never once mentioned to them that Barbara Maher attacked you or grabbed you in any way?

"A. I didn't want to discuss it at all until I had a lawyer present.

"Q. So, if you kind of focus in on my question, during the entire hour conversation you had with Detective Findling, or forty minutes, or however long it was, you never once told them that Barbara Maher attacked you or grabbed you in any way; is that right?

"A. That's accurate.

"Q. And during this entire hour, or forty-minute conversation, or however long it was that you had with Detective Findling where you told him about what happened, you never once told him about this mystery man, did you?

"A. No. I was waiting for a lawyer to be present, then I was going to tell him.

"Q. And isn't it also true that you told Detective Findling during this conversation that you felt that you deserved the maximum for what you had done and that you should never be on the streets again?

"A. No, I did not.

"Q. So if he says that you told him that you shouldn't be on the streets and that you deserved the maximum, would he be lying about that?

"A. The only thing I can recall about the street, I said if I had been more streetwise, this wouldn't have — would have never happened.

"Q. Okay. But let me ask this question again. If he says that you told him that at that point you felt you should get the maximum and that you felt in your own mind that you shouldn't be out on the streets, would he be lying about that?

"A. Yes, he would."

Prior to the trial of this case, the trial lawyers of this state were emphatically advised in *State v. Middleton,* 294 Or 427, 438, 657 P2d 1215 (1983), that "[w]e expressly hold that in Oregon a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth." We have since restated that position with emphasis. *State v. Milbradt,* 305 Or 621, 629-30, 756 P2d 620 (1988). We now

inform all trial counsel that this type of cross-examination will not be tolerated in any court of this state.

In rebuttal, the state called one of the detectives who interrogated defendant, and the detective testified as follows. At the outset of the interrogation, defendant told them that he did not want to talk to them. They continued to question him, however, for a little more than an hour. During that time, defendant once more said that he did not want to talk to them and twice asked for a lawyer before further questioning.[2] He eventually admitted killing Maher and stated that he deserved "the maximum" for doing so. He never mentioned an attack on him by Maher or anyone else.

■        Article I, section 12, of the Oregon Constitution provides, in part: "No person shall * * * be compelled in any criminal prosecution to testify against himself." In *State v. Kell*, 303 Or 89, 94-95, 734 P2d 334 (1987), we interpreted Article I, section 12, as it pertained to uncounseled out-of-court statements by a criminal defendant. We noted that then a majority of this court had not agreed whether *Miranda*-type warnings are required under the Oregon Constitution, but unanimously agreed, "Miranda questions aside, once a suspect in custody unequivocally requests to talk to a lawyer, that request must be granted and questioning should cease." This admonition should not have come as any surprise to police officers in this state. In *State v. Mendacino*, 288 Or 231, 603 P2d 1376 (1979), "[d]espite the defendant's repeated statements that he did not want to talk and that he wanted an attorney, the detectives continued the interrogation and elicited a confession from the defendant." 288 Or at 233. A few hours later, the detectives elicited a second confession. The trial judge ruled that the two confessions were inadmissible. The issue before this court was whether a third confession was so tainted by the first two that the third must also be suppressed. We unanimously said:

> "The police station confessions were rendered inadmissible not because the required warnings were inadequate, rather, the trial judge found that the detectives persisted in

---

[2] There is no evidence or contention that defendant's requests to remain silent and to have the assistance of a lawyer were "equivocal," *cf. State v. Kell*, 303 Or 89, 95, 734 P2d 334 (1987), or that defendant initiated further interrogation after making these requests, *cf. State v. Foster*, 303 Or 518, 739 P2d 1032 (1987).

questioning the defendant after he had indicated that he didn't want to talk and wanted a lawyer. Therefore the confessions partake more of actual coercion. * * *

"* * * * *

"In light of all these circumstances, we are required to hold that the coercive conditions which resulted in the first two inadmissible confessions were not effectively removed. * * *"

288 Or at 238.

Also in 1979, in *State v. Haynes,* 288 Or 59, 602 P2d 272 (1979), we held that the prosecution could not use against a defendant statements obtained from him while in police custody after the police, but not the defendant, knew that a lawyer sought to consult with the defendant at the instigation of the defendant's wife. There we held that the defendant's statements must be suppressed even though the defendant himself had not sought to stop questioning to consult with a lawyer.

We are aware that the admonition from *Kell,* quoted above, came after the conduct of the police officers in the case at bar, but the admonition was not new. We now add to the admonition this flat rule: Upon request for counsel, questioning not only "should" but must cease.

In the case before us, the interrogating officers blithely ignored defendant's request for a lawyer in the hope of obtaining statements from him to be used for impeachment purposes in the event he testified. This was not a case of a technical *Miranda*[3] violation as set forth and interpreted by the federal courts. The acts of the police officers were a violation of our earlier holdings, as embodied in the specific admonition of this court in *Kell.* The fact that the officers admittedly were following the federal interpretation of the utility and admissibility of such statements under federal law as set forth in *Oregon v. Hass,* 420 US 714, 95 S Ct 1215, 43 L Ed 2d 570 (1975) (*reversing sub nom State v. Haas,* 267 Or 489, 517 P2d 671 (1973)), is of no consequence. We are concerned with interpreting the Oregon Constitution on this issue and are not dependent on or restricted by federal law. We are not confronted here with a situation like that in either *Harris v.*

---

[3] *Miranda v. Arizona,* 384 US 436, 86 S Ct 1602, 16 L Ed 2d 694 (1966).

*New York,* 401 US 222, 91 S Ct 643, 28 L Ed 2d 1 (1971), or *State v. Brewton,* 247 Or 241, 422 P2d 581 (1967). In those cases, no warnings were given and no request for a lawyer was ever made. We do not now decide the admissibility of such uncounseled out-of-court statements offered for impeachment purposes under Oregon law. That issue remains an open question.

The case before us could not present a better argument for the exclusion of defendant's statements for impeachment purposes. In the circumstances present in *Harris* and *Brewton,* namely, a mere failure to provide the defendants with information required by *Miranda* and *State v. Neely,* 239 Or 487, 395 P2d 557 (1964), *modified* 239 Or 494, 398 P2d 482 (1965), respectively, the argument that exclusion of evidence from the state's case-in-chief provides sufficient incentive for police officers to give the required information is at least plausible.[4] There is no incentive at all, however, coming from a rule that permits the admission for impeachment of statements obtained through interrogation after a suspect has refused to talk or has asked for a lawyer. Once a suspect invokes the right to remain silent or the right to consult a lawyer, the police are unlikely to get anything further without counsel present unless they continue to interrogate the suspect. Under such a rule, any statements made before the invocation of rights would still be fully admissible, and any statements made thereafter would be admissible for impeachment. Indeed, the detectives who interrogated defendant were well aware of the advantages to the state of continued interrogation; at one point in their interrogation, they even went so far as to inform defendant that his statements would be

---

[4] Nonetheless, this court rejected the argument in *State v. Brewton,* 247 Or 241, 245, 422 P2d 581 (1967):

"If we should today adopt a restrictive application of the exclusionary rule, * * * [t]his court would in effect be saying to the overzealous that police officers will be free in the future to interrogate suspects secretly, at arms length, without counsel, and without advice, so long as they use means consistent with threat-or-promise voluntariness, and so long as they understand that they may file the information only for use to keep the defendant honest. Thus the police could, at their option, take a calculated risk: By giving up the possibility of using the suspect's statements in the state's case, they could obtain by unconstitutional means and store away evidence to use if the defendant should elect upon trial to take the stand."

admissible only if he testified at trial. Thus, far from discouraging the police, the federal rule they were following actually encourages unconstitutional interrogation where the suspect has taken the police at their word and declined to talk. *See State v. Haas, supra,* 267 Or at 493; *Oregon v. Hass, supra,* 420 US at 725 (Brennan, J., dissenting); *People v. Disbrow,* 16 Cal 3d 101, 113, 545 P2d 272, 279 (1976); Dershowitz & Ely, Harris v. New York: *Some Anxious Observations on the Candor and Logic of the Emerging Nixon Majority,* 80 Yale L J 1198, 1218-21 (1971).

No one, including a criminal defendant, has the "right" to give false testimony. Nor does anyone have the "right" to commit murder or robbery. But all citizens, including criminal defendants, have constitutional rights, and the state may not prove, over objection, any crime with unconstitutionally obtained evidence. The defendant was entitled under the Oregon Constitution to have a lawyer present at the time of his out-of-court interrogation by the police. He unequivocally exercised that right by telling the police that he did not want to make any statement without his lawyer present. The police purposely disregarded that request and thereby intentionally violated defendant's constitutional right to counsel. The notion that police can continue to interrogate a person in violation of his state constitutional right to counsel and his rights against self-incrimination is pure fiction. Police officers have a duty to uphold the constitution of this state and may not intentionally violate a person's constitutional rights without serious sanctions. They have an absolute obligation to cease all questioning once the request for counsel has been made. Because defendant's statements were made after a request for counsel and were induced by continued questioning by the police, they were obtained in violation of Article I, section 12, of the Oregon Constitution and should have been suppressed by the trial court.

The state contends that any error in admitting defendant's statements for impeachment was harmless and that, for that reason, his conviction should nonetheless be affirmed. Under Oregon law, a verdict against a criminal defendant may be affirmed notwithstanding trial error if the error did not affect a "substantial right" of the defendant. OEC 103(1). This court has interpreted this to mean that the verdict may be affirmed if there is "little likelihood that the error affected

the verdict." *State v. Hansen,* 304 Or 169, 180-81, 743 P2d 157 (1987); *see also State v. Miller,* 300 Or 203, 220-22, 709 P2d 225 (1985). The state contends that the admission of defendant's statements was harmless because defendant admitted killing Maher, because "evidence independent of the statements had already been received which established a number of points addressed in the statements" and because the state's case was otherwise strong.

Defendant did indeed admit killing Maher, but the central factual issue in the case was whether defendant, as he contended, killed Maher accidentally in self-defense during an effort by Maher and an unknown companion to "roll" him or, as the state contended, defendant killed Maher intentionally and without justification. The state's version of events was supported by the absence of evidence of a struggle and by medical testimony that the stab wounds in Maher's body were not inflicted accidentally or in the course of a struggle. On the other hand, there were no witnesses to the killing of Maher and, as the state conceded in its closing arguments to the jury, no apparent motive for defendant to have killed her. Defendant's statement to the police that he deserved the maximum penalty and his failure to mention any attack by Maher during the interrogation would have suggested to jurors an admission by defendant that his killing of Maher was intentional and not in response to any attack by her. Although the state's case against defendant is strong even in the absence of defendant's statements, we cannot say that there was little likelihood that the error affected the verdict.

This case was tried prior to our decision in *State v. Wagner,* 305 Or 115, 752 P2d 1136 (1988). Defendant here has raised many contentions that were made in *Wagner* and some in addition thereto. Because we are not sitting in this case solely as a law announcing court, but also as a direct appellate review court, it is not necessary for us to reach those other contentions in light of our holding that the trial court committed reversible error as set forth above.

The judgment of conviction and sentence of death are reversed, and the cause is remanded to the trial court for a new trial.

**GILLETTE, J.,** concurring.

The court today announces a salutary principle of constitutional law — the state will not be permitted to use, for any purpose, evidence extracted from a criminal defendant by a knowing violation of the defendant's right to counsel under Article I, section 12, of the Oregon Constitution. The decision is unanimous. I write separately only because I have, in the not too distant past, argued the other side of this question, and I feel a responsibility to explain briefly what has led me to change my mind.

In *State v. Mills,* 76 Or App 301, 710 P2d 148 (1985), *rev den* 300 Or 546 (1986), a seven-member majority of the *en banc* Court of Appeals held that use of *Miranda*-violative statements for impeachment purposes does not violate the Oregon Constitution. I was the author of that opinion, which was the result of an extensive examination of the pertinent authorities. As I reread that opinion now, however, I am forced to admit that it argued more passionately than persuasively. The opinion concluded:

> "[W]e believe it is a perversion of an Oregon constitutional right to turn a shield (the right to keep the state from using illegally obtained evidence) into a sword (the right to take affirmative advantage of the unavailability of that evidence to work a fraud on the trier of fact). One of the functions of the exclusionary rule is to preserve the integrity of our judicial system by refusing admission to evidence that was obtained in violation of the document that created the judicial system — the constitution. But a court system that countenances perjury also loses its integrity — there can be no respect for law when a court is not even free to insist that witnesses appearing before it obey the oath they take to tell the truth. The proper balance of these twin challenges to the integrity of our judicial system is, we think, to permit a defendant to keep illegally obtained evidence from a jury unless he takes the stand — something he cannot be compelled to do — and, by his testimony, makes that evidence pertinent to determining whether he is telling the truth. This is a very limited rule: The evidence against defendant is not made *generally* admissible if he testifies; it is admissible only and to the extent it impeaches a statement he had made under oath at trial. He is still free to testify as to other matters, and many defendants may choose to do so. But he is not free to take the oath with his fingers crossed.

"A defendant's right to testify does not exist in a vacuum independent from the truth-seeking purpose of our judicial process, a process in which the technique of impeachment plays a vital role. To eliminate one of the impeachment process' more valuable tools — the use of prior inconsistent statements that are otherwise reliable — simply licenses perjury. This we will not do. We accordingly reject defendant's argument for an independent rule under Article I, section 12, of the Oregon Constitution. \* \* \*"

*Id.* at 310-11.

Those are strong words, but I am afraid that they are wrong. The flaw in *Mills* was that it raised the chance to impeach a defendant during trial above the proscriptions of our Constitution. It did this in the name of "judicial integrity." But the Constitution, and our faithfulness to it, is this court's — or any court's — true integrity.

What the police did in this case was lawless. Worse, it was calculated lawlessness. This court is constantly called upon to hold the other two branches of the government, the legislative and the executive, within constitutional bounds. We cannot expect to be listened to for long if we decry such unconstitutional acts in general, but wink at them when we think they make the work of our own, judicial branch easier.

It may be true that, by our ruling today, we give a determined perjurer a better chance at misleading the trier of fact. But we give no "license" — we do not guarantee his success. Juries and judges have other ways of detecting perjured testimony — they've been doing it for centuries. On the other hand, the *Mills* approach *did* license calculated violations of the Constitution, as the actions of the officers in this case demonstrate. Today, this court says, "No more." Persuaded by reflection and by history, I concur.