Argued and submitted September 7, 1989, the judgment affirmed as to guilt phase and reversed as to penalty phase and case remanded to the circuit court for resentencing January 11, 1990

# STATE OF OREGON,
*Respondent,*

*v.*

# REYES MIRANDA,
*Appellant.*

## (CC C87-03-31650; SC S34970)

786 P2d 155

Stephen J. Williams, Deputy Public Defender, Salem, argued the cause for appellant. With him on the brief was Gary D. Babcock, Public Defender.

Brenda J Peterson, Assistant Attorney General, Salem, argued the cause for respondent. With her on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Diane S. Lefkow, Michael C. Livingston, Janet A. Metcalf, and Timothy A. Sylwester, Assistant Attorneys General, Salem.

JONES, J.

Linde and Fadeley, JJ., dissent for the reasons stated in the dissenting opinions in *State v. Wagner,* 309 Or 5, 20, 786 P2d 93 (1990), and *State v. Moen,* 309 Or 45, 98, 786 P2d 111 (1990).

## JONES, J.

This is a case of automatic review of a conviction of aggravated murder and sentence of death. Defendant challenges both his conviction and the resulting sentence. We find his extensive arguments concerning the guilt phase not well taken and affirm his conviction for aggravated murder. We find the sentencing proceeding to be inadequate for the reasons set forth in our opinion in *State v. Wagner,* 309 Or 5, 786 P2d 93 (1990), and so remand the case to the circuit court for a new sentencing proceeding.

## FACTS

The relevant facts of this case are that defendant Miranda and co-defendant Nefstad met Steven Jackson, the victim, for the first time at the Acropolis Tavern in Milwaukie sometime after midnight on the morning of the murder. The three left the tavern at about 1:45 a.m. in Miranda's Plymouth. At 2:37 a.m. Miranda was photographed withdrawing $200 from Jackson's account using Jackson's bank card. Sometime between when the three left the tavern and Miranda's use of Jackson's bank card, Jackson was brutally murdered with multiple stab wounds ranging from his head to his knees, with the fatal wounds to his heart. The blood from Jackson's body was emptied into defendant's car. Defendant Miranda admitted to his friends that he had killed the victim and that after the stabbing his car looked like "Psycho III." When first arrested, defendant lied to the police about some "black man" doing the killing, but later retracted that statement and at the time of trial attempted to lay the blame for the killing on co-defendant Nefstad. The jury rejected defendant's version of the events and found that he and Nefstad had robbed and killed the victim.

## GUILT PHASE

Defendant makes 17 assignments of error with respect to the guilt phase of his trial. We have reviewed all of them. Most relate to various aspects of this particular case, are not well taken, and would add nothing to the body of law surrounding criminal prosecutions if discussed at length. Those that relate more generally to the question of the constitutionality or applicability of the death penalty statutes themselves have been answered elsewhere, most notably in

*State v. Wagner, supra,* and *State v. Farrar,* 309 Or 132, 786 P2d 161 (1990), and will not again be discussed here. There are two assignments of error, however, that raise novel questions that call for fuller discussion by this court. We turn to those questions now.

## I.

Defendant claims that the trial court erred in allowing the state to impeach his trial testimony with statements defendant made after he requested the assistance of an attorney during custodial interrogation after his arrest.

Defendant was interrogated by two detectives on the night he was arrested. Defendant Miranda was given his *Miranda* warnings and agreed to talk with the officers. While he was questioned concerning his actions on the night of the killing, he was confronted with photographs taken of him at a First Interstate Bank automatic teller machine. He was at the bank using the victim's credit card to obtain $200 in cash. He denied that he was the person in the photographs and then told police that he thought his girlfriend had set him up. When the detectives asked defendant about bloody clothing he had taken to her house, defendant responded, "I think I better have a lawyer." The questioning continued and defendant ultimately admitted being with the victim and another man in defendant's car when the other man killed the victim. Defendant then agreed to take the police to the place where the victim's body had been left in Vancouver, Washington.

At trial, defendant moved to suppress all statements made after he requested an attorney and all evidence discovered as a result of his statements. The state responded by conceding that the statements made after his request for an attorney were unlawfully obtained, and the prosecutor agreed not to introduce those statements in the state's case-in-chief but contended that the statements were admissible for impeachment if defendant testified at trial.[1] The trial court did not rule on the admissibility of the statements.

The state also conceded that the victim's body was

---

[1] This case was tried before this court decided *State v. Isom,* 306 Or 587, 761 P2d 524 (1988), which held that the use of unlawfully obtained statements is prohibited for impeachment purposes as a violation of Article I, section 12, of the Oregon Constitution.

found as a result of the unlawfully obtained statements; however, the prosecutor argued that the evidence concerning the location and condition of the body was admissible under the "inevitable discovery" doctrine. The trial court held that the body inevitably would have been discovered and denied defendant's motion to suppress it. The judge's decision that the body inevitably would have been discovered is supported by ample evidence.

During the guilt phase of the trial, none of defendant's out-of-court statements made to the police were elicited or alluded to during the state's case-in-chief. After the state rested, defendant took the stand in his own defense and testified on direct examination:

"Q. [By defense counsel:] At the time you were arrested by the Portland Police, *did you give a statement?*

"A. A statement?

"Q. *Did they ask you about what had happened in the car* and you gave a statement?

"A. To the Portland Police?

"Q. Right.

"A. Yes. Once I was at the Yamhill County Police Department.

"Q. And at that point *did you conceal the identity of Mr. Nefstad?*

"A. Did I conceal it? *Yes, I did.*

"Q. *What did you tell the Portland Police about the other person that had been with you on that night at the Acropolis Tavern?*

"A. *I told them it was a black guy that was with me.*

"* * * * *

"Q. *Did you describe the events of that particular night to the Portland police officers?*

"A. *Yes and no,* I guess you can say.

"Q. *With the exception of identifying the other person as a black man and not saying it was Mr. Nefstad, was the rest of what you said accurate, to the best of your recollection?*

"A. *I don't really remember what I told them that night. I was giving them a story, so to speak.*

"* * * * *

"Q. *After you had given the statement to Detective Hill,* did you then show them the area in Vancouver where you now described these events took place?

"A.  Yes, I did.

"Q.  Did you actually take the police officers over there?

"A.  That's correct."[2] (Emphasis added.)

On cross-examination, the prosecutor, without objection, elicited further details from defendant about the statements to the police that he had referred to on direct examination:

"Q.  [By prosecutor:] Now, do you *recall* telling Detective Macdonald that — at that time that after the victim, Mr. Jackson, and the black man and you went out to the car from the Acropolis and smoked some dope, that you went back into the Acropolis? Do you remember that?

"A.  I don't really recall what happened in that conversation because I was emotionally upset at that time.

"Q.  * * * Do you remember telling him at that time that you went back into the Acropolis, and then you came back outside and went — you came back outside and that *the black male had his left arm around the victim's neck in a headlock* and that *the black male* told you that he *had the victim's bank card* and that they were going to go to a bank and withdraw money from the victim's account through an automatic teller machine?

"A.  I don't remember saying that.

"Q.  Now, do you remember then contradicting yourself and saying that it wasn't until you arrived at the bank that *the black male handed you Mr. Jackson's bank card* and that the victim told you the personal identification number to the bank card and that he did this after *the black male threatened to kill him as you were outside the bank?*

"A.  Like I said, I don't recall any conversation that I made at that time.

"Q.  Well, are you telling us that happen[ed], what I have just described? Did that happen?

"A.  I don't know. Time-wise I was —

---

[2] Defendant's counsel previously had advised the jury in opening statement that defendant "Miranda is the one who took the police back over to Vancouver and pointed out to them the place on the road where Jackson and Nefstad got out of the car. *That he tried to cooperate with the police at that point.*" (Emphasis added.)

"Q. You have said that you don't remember that. I am asking you whether those events occurred.

"A. *Oh, no, they did not.*

"Q. Now, would you also indicate for me whether when you returned to the car after withdrawing the money from the bank machine that you told Detective Macdonald that *the black male was either stabbing the victim or punching him in the chest saying 'This mother fucker is dead. Let's take him someplace.'*

"A. I don't recall any of that conversation.

"* * * * *

"Q. Do you recall telling Detective Macdonald that the victim was either walking or stumbling after he left the car, and that *the black male then threw the victim into a ditch* adjacent to the road, got back in the car and stated 'Let's go'?

"A. I never — I don't recall saying that." (Emphasis added.)

The state never called Detective Hill or Macdonald to testify that defendant, in fact, made any of these statements.

Defendant acknowledges that he did not object to the evidence that he now claims was erroneously admitted. When the prosecutor made it clear that the state was conceding that the statements were inadmissible in its case-in-chief, defense counsel advised the court that if use of the statements becomes an issue, "we can deal with it at the time it arises." Instead of resisting the use of the statements, defendant brought out the statements on direct and then, on cross-examination, simply claimed that he did not recall the details of the statements which he admitted on direct examination consisted of a concocted tale.

■ When defense counsel, on direct examination of a defendant, asks what the defendant told the police after he had requested counsel, it is not the duty of the trial judge to *sua sponte* step in and object. Likewise, when the defense elects on cross-examination not to object to the prosecutor's questions about the false statements, it would have been folly for the court to step into the role of defense counsel and object. The defense may well have chosen this strategy to focus on false details in order to divert the jury's attention from the actual facts of the case, which included the following:

Defendant's defense was that it actually was Nefstad who had committed the murder. Miranda made pre-arrest incriminating admissions that he had put his knife to the victim's throat; that he had stabbed the victim in the knee; that he had stabbed the victim seven or eight times in the chest; that he had killed the victim in Miranda's car; and that he had dumped the victim's body in the Gorge or in a ditch. All of these damaging admissions were consistent with the physical evidence. The state discovered Miranda's bloody clothing that he had worn at the time of Jackson's murder and discovered the blood remaining in his car even after he had attempted to wipe it down. It was Miranda who had used the victim's bank card on the night of the killing and who, on the days following the murder, returned repeatedly to various teller machines to withdraw money from the victim's bank account. Miranda also was in possession of Jackson's truck the morning after he was killed.

■ A defendant's own inquiry on direct examination into the contents of otherwise inadmissible statements opens the door to further inquiry on cross-examination relating to those same statements. Here, defendant sought to reap the benefit of placing before the jury the evidence that at the time of his arrest he: (1) gave the police a statement about "what happened in the car"; (2) told the police about "the events of that particular night"; (3) gave the police an accurate account of what happened that night, except for saying that the other man was a "black man"; and (4) cooperated with the police by taking them to the body. He thus sought to convey to the jury that he had "come clean" by confessing to the police and by taking them to the body. This was his selected trial strategy. That it was not accepted by the jury provides no basis for excluding cross-examination about its details.

The record indicates that defendant's counsel decided, after he had had an opportunity to hear the state's case-in-chief, to use some of defendant's statements to the police to defendant's benefit and not to object to the admission of the remainder. Counsel's comments at the pretrial hearing that he might later object to the impeachment evidence shows that he was well aware that such an objection could have been made, and the trial court did not limit further objections.

■     By affirmatively introducing selected portions of his conversations with the officers, defendant invited further inquiry on cross-examination and he could not limit the state's cross-examination of him concerning those statements. The trial court did not err in this respect. The evidence was invited, not shunned, as in the case of *State v. Isom,* 306 Or 587, 761 P2d 524 (1988).

## II.

The only other assignment of error that warrants discussion is whether the state in the guilt phase of the trial failed to prove venue or jurisdiction. Defendant asserts that

> "jurisdiction in Oregon and venue in Multnomah County must be established by proving beyond a reasonable doubt that Jackson was either killed in Oregon or received a blow in this state that eventually caused his death."

■ ■     The trial court correctly denied defendant's motion for judgment of acquittal because sufficient evidence was before the jury from which it could determine beyond a reasonable doubt that defendant murdered Jackson within this state, or at least delivered the fatal "blow" within this state.

The jury had heard admissions that defendant had put his knife to the victim's throat, that he then stabbed the victim in the knee, that he then stabbed the victim seven or eight times in the chest, and that the victim's blood was all over defendant's car, his pants, and his shirt, and that he changed his shirt at his girlfriend's house because it had some blood on it. The only evidence connecting the death of the victim to the state of Washington is that the victim's body was found there. The medical examiner established that all of the victim's blood was already out of his body before it was dumped in Vancouver. There was no evidence of blood loss at the scene where the body was found. The medical examiner's evidence indicated that the victim had been stabbed while sitting in defendant's car and lost the blood while in that position.

The crucial piece of evidence supporting a conclusion that the victim was stabbed in Multnomah County is that at 2:37 a.m. on the night of the killing the photographs taken at the bank at Southeast 82nd and Foster in Portland show what

appears to be blood on defendant's shirt while he was stealing $200 from the victim's bank account. From this evidence, coupled with defendant's statement, a jury could infer and find beyond a reasonable doubt that the stabbings took place in Multnomah County before the victim's body was driven across the river and dumped in Vancouver, Washington. Venue and jurisdiction may be established by circumstantial evidence and inferred by the jury from all of the facts in the case. *See, e.g., State v. Bowling,* 243 Or 344, 347, 413 P2d 421 (1966); *State v. Cooksey,* 242 Or 250, 251, 409 P2d 335 (1965); *State v. Jones,* 240 Or 129, 130-31, 400 P2d 524 (1965); *State v. Sack,* 210 Or 552, 556, 584, 300 P2d 427 (1956), *cert den and appeal dismissed* 353 US 962 (1957).

## PENALTY PHASE

As we have stated this date in *State v. Wagner, supra,* consistent with the the United States Supreme Court's decision in *Penry v. Lynaugh,* 492 US ___, 109 S Ct 2934, 106 L Ed 2d 256 (1989), and ORS 163.150, in a death penalty case the trial judge must instruct the jury on a fourth question on the subject of mitigation, if constitutionally required. The trial court failed to give such an instruction. The holding in *Wagner* requires that this case be remanded to the trial court for retrial of the penalty phase only, consistent with the procedures set forth in that opinion.

■ Pursuant to our opinion in *Wagner,* in the penalty phase the trial court must instruct each juror on the four issues set forth in ORS 163.150(1)(b), which statutory instructions may (but need not) read as follows:

1. Was the conduct of the defendant that caused the death of the deceased committed deliberately and with the reasonable expectation that death of the deceased or another would result?

2. Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society? In determining this issue, you shall consider any mitigating circumstances offered in evidence, including, but not limited to, the defendant's age, the extent and severity of the defendant's prior criminal conduct and the extent of the mental and emotional pressure under which the defendant was acting at the time the offense was committed.

(If raised by the evidence) 3. Was the conduct of the

defendant in killing the deceased unreasonable in response to the provocation, if any, by the deceased?

4. Should defendant receive a death sentence? You should answer this question 'no' if you find that there is any aspect of defendant's character or background, or any circumstances of the offense, that you believe would justify a sentence less than death.

As we stated in *Wagner,* in the fourth question proposed above we are asking the jury to consider any mitigating aspect of defendant's life, alone or in combination, not necessarily related causally to the offense, in making its finding. 309 Or at 20.

■ If any juror votes "no" on any of the four questions, the death penalty may not be imposed, because a sentence of death by a jury must be unanimous. Acceptable instructions relating to evidence and proof of mitigating circumstances are set out in *State v. Farrar, supra,* decided this date.

The judgment is affirmed as to the guilt phase and reversed as to the penalty phase, and the case is remanded to the circuit court for resentencing consistent with this opinion.

**LINDE and FADELEY, JJ.,** dissent for the reasons stated in the dissenting opinions in *State v. Wagner,* 309 Or 5, 20, 786 P2d 93 (1990), and *State v. Moen,* 309 Or 45, 98, 786 P2d 111 (1990).