Argued and submitted March 30, affirmed November 12, 2015, petition for review denied March 3, 2016 (358 Or 794)

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

JAMES GUY ABBOTT,
*Defendant-Appellant.*

Multnomah County Circuit Court
130230735; A154573

362 P3d 1171

Eric R. Johansen argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Carson L. Whitehead argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Sercombe, Presiding Judge, and Hadlock, Judge, and Tookey, Judge.

HADLOCK, J.

**HADLOCK, J.**

Defendant, who concedes that he was properly convicted of first-degree theft, challenges his convictions for first-degree robbery, unlawful use of a weapon (UUW), menacing, and second-degree robbery. The charges that led to those latter convictions were premised on allegations that defendant used or threatened to use force in conjunction with committing the theft. Defendant raises eight assignments of error on appeal, all relating to a single issue: whether the trial court erred by allowing the prosecutor to ask defendant, who testified at trial, whether other witnesses had lied when they described events differently than defendant had. We conclude that, although the trial court erred when it overruled defendant's objections to some of the prosecutor's questions, that error was harmless. Accordingly, we affirm.

We describe the relevant evidence as presented both by the state's witnesses and by defendant, who testified at trial. In doing so, we highlight those aspects of the prosecutor's cross-examination of defendant that form the basis of defendant's arguments on appeal.

Alvin and Toby Scheps, who are in their early 70s, often participated in a weekly swap meet at an Eagles Lodge in Portland, where they bought and sold jewelry and "scrap gold." The couple often displayed several thousand dollars worth of gold and jewelry; they also kept several thousand dollars worth of cash on hand. Alvin Scheps carried a bag that looks like a purse and has compartments in which he kept cash, gold, and jewelry, taking cash out of the bag when he needed it. He also carried a firearm.

One afternoon in February 2013, Pool, who worked at the Eagles Lodge, saw defendant hanging around the lodge for about an hour before the theft occurred. Alvin Scheps also noticed defendant, whom he had never seen before, walking around the lodge. Scheps thought that defendant might be with a group that was going to use the facility for another purpose after the swap meet closed, partly because he saw defendant fold up a table, like other members of that group were doing. Soon thereafter, as Alvin and Toby Scheps were packing up to leave, defendant stole Alvin Scheps's bag from the chair that it had been on. Toby Scheps called out, saying,

"That man stole our bag." Pool pursued defendant, who had run out of the building.

Pool got into a truck, drove for a block, and then spotted defendant "running fast and putting something in his pant pockets." Pool also saw that defendant had Alvin Scheps's bag. Pool jumped from the truck, defendant threw the bag onto the ground, and Pool picked up the bag, tossing it into the truck. At that point, Pool had lost sight of defendant, but a man working nearby—later identified as Bustamante—pointed in the direction that defendant had gone. Pool told Bustamante that defendant had robbed some people. Pool then drove to a nearby restaurant and asked another pedestrian if he had seen anybody running; the pedestrian pointed toward some bushes, and Pool saw feet sticking out from under a bush, as well as defendant's face.

Pool struggled with defendant, trying to pull him out from under the bush. At some point during the struggle, defendant said, "Leave me alone, I have a gun." Pool believed that defendant might actually have a gun, because Pool knows that Alvin Scheps carried a weapon and thought it might have been in the bag that defendant stole. Pool left because, as he put it, "I'm not a friend of weapons and I didn't want to verify if he had a weapon or not." He returned to the Eagles Lodge and gave the bag to Alvin Scheps, who discovered that its contents were missing.

Pool also spoke to police officer Brennan, who had responded to a call about the theft, telling him where he had left defendant and that defendant might have a gun. Brennan broadcast that information to other officers who were investigating the crime. At that point, Brennan also received information that defendant was in a fight with somebody in a particular alleyway, and he departed for that location without having time to ask Pool more questions about why he thought defendant might have a gun.

In the meantime, Bustamante had spotted defendant in the bushes and told him to "hang tight" until police officers arrived. Defendant did not stay long; instead, he emerged from the bushes and ran down an alley, with Bustamante in pursuit. Bustamante caught up to defendant and grabbed his sweatshirt. Defendant repeatedly asked

Bustamante to let him go, saying, "They got their stuff back." Bustamante restrained defendant for several minutes, as defendant "continually tried to get up." Bustamante was holding onto defendant by his sweatshirt, pulling on it to keep defendant down, and the sweatshirt eventually came over defendant's head, leaving him shirtless. Bustamante testified that he did not punch, strangle, or hit defendant.

A neighbor (Knepell) who observed some parts of the interaction saw Bustamante attempting to keep defendant on the ground. She saw "no violence" like Bustamante hitting defendant with a stick or a post. She did observe defendant yelling things like, "get your hands off me," even when Bustamante was not touching him. Knepell also called 9-1-1.

Defendant was able to get up after his shirt came off, and he picked up a piece of broken concrete, which Bustamante estimated was about five inches in diameter. Defendant raised the concrete over his head with two hands in what Bustamante "thought was an extremely threatening manner"; Bustamante's "obvious fear" was that the concrete could have struck him in the head if defendant threw it. Bustamante immediately moved and loudly told defendant to put the rock down. Because Bustamante had spotted police officers nearby, he backed away from defendant very quickly, knowing "that the police were two to three seconds from rounding" a corner into the alley.

Indeed, officers quickly rounded the corner, saw Bustamante retreating, and repeatedly told defendant to put down the concrete, which he did after several commands. Although defendant was noncompliant, officers were eventually able to handcuff him and take him into custody.

Brennan read defendant *Miranda* warnings and, after defendant said that he understood them, explained to defendant why officers were there and what they had been told. Defendant told Brennan that he had been at the Eagles Lodge only briefly before he stole the bag. Defendant said he was then chased by a man who told him to give back the bag. According to defendant, he complied and gave the bag and all of its contents to the man who had chased him, who turned out to be Pool. At that point, Brennan thought

that defendant actually might have given the bag and its contents to Pool because defendant "was adamant that he didn't have anything with him," having returned it all, and he "just wanted to be done" and not get chased anymore. Defendant said that, if anything was missing from the bag, it must have been Pool who stole it. Officers patted defendant down for weapons and put him into Brennan's patrol car for transport to a police station.

Brennan testified that, when he took defendant out of the patrol car after they arrived at the station, the back seat of the car "looked like a jewelry store exploded." Small pieces of gold, jewelry, and "lots and lots and lots of little things [were] all over the place." Brennan then searched defendant more thoroughly and found over $4,800 in cash, wedged between his buttocks.

Detective Reynolds interviewed defendant a few hours later. Defendant told Reynolds that he had gone into the Eagles Lodge to use the bathroom, picked up the bag, and then walked out of the building. Defendant also said that he took the cash and gold out of the bag and resisted giving it back because he wanted to keep it; his plan was to buy drugs with the stolen money.

Defendant admitted to Reynolds that he had threatened Bustamante with a fairly large rock, saying that he did so because Bustamante had hit him repeatedly with a stick. Defendant told Reynolds that he had given other police officers permission to search him and had told them that the cash and gold were in his pants pocket. Defendant denied that the cash had been between his buttocks. Defendant asked Reynolds several times about the possibility of obtaining medication because he was withdrawing from cocaine and methamphetamine.

Defendant was charged with five crimes: first-degree theft, first-degree robbery, second-degree robbery, UUW, and menacing. As detailed in the indictment and fleshed out in the state's closing argument at trial, the charges were based (generally speaking) on allegations that defendant had committed the following criminal acts: stealing the bag that contained cash, jewelry, and gold (first-degree theft); threatening Bustamante while using or attempting to use a

dangerous weapon—the concrete chunk—against him, while also attempting to keep the stolen property (first-degree robbery); threatening Pool while purporting to be armed with a firearm, again while attempting to keep the stolen property (second-degree robbery); unlawfully attempting to use the chunk of concrete against Bustamante (UUW); and intentionally attempting to place Bustamante in fear of imminent serious physical injury by threatening him with the concrete chunk (menacing).

The case went to trial and the state put on evidence consistent with the facts described above. After the state rested its case-in-chief, defendant testified in his own behalf, painting a very different picture of events. Defendant testified that, although he had used drugs a few days before the incident (and had been awake for over four days), he was not under the influence of drugs, had "already [come] down" when he went to the Eagles Lodge, and was not experiencing withdrawal. He denied that his ability to clearly perceive and recall events was affected by having been awake for so long.

Defendant testified that, after he went into the Eagles Lodge to use the bathroom, he saw the bag sitting in a place where nobody was around, and heard somebody asking whose bag it was. Defendant described the bag as "like a food backpack thing" and testified that he picked it up because he was hungry. According to defendant, he walked out of the lodge nonchalantly, looked into the bag after he had walked a few blocks away from the lodge, and discovered that the bag held cash and jewelry. Defendant took those items from the bag and put them in the pockets of the shorts that he was wearing beneath his pants. Defendant denied that he had been in the lodge for more than a few minutes, denied that he had been "casing the place," and denied that he had folded up any tables while he was there.

After he walked away from the Eagles Lodge, defendant testified, Pool pulled up in a truck and started yelling at him in Spanish and limited English, saying something about a "pistol." Defendant dropped the bag and started running because he did not know whether Pool had a gun. Defendant denied that he ever told Pool that he had a gun

himself. Defendant testified that he told both Brennan and Reynolds that he had thought that Pool had a gun. Defendant also denied that he ever hid under a bush; rather, he saw both Pool and Bustamante, and walked away from them. Defendant could not explain why Pool stopped chasing him.

On cross-examination, the prosecutor asked defendant whether it was his contention that Pool had lied on the witness stand to get defendant into trouble. The trial court overruled defendant's objection to the question, and defendant testified that he was not contending that Pool had lied and said that he, defendant, did not know Pool's intent.

Defendant also testified about his interaction with Bustamante. According to defendant, he was walking down the alley when he "was clobbered in the back of the head." He rolled over and saw Bustamante standing over him with a raised fencepost in his hand. Bustamante then hit him twice more. In addition, defendant testified, Bustamante pushed the fencepost into defendant's stomach and twisted it around as defendant yelled in pain. Defendant picked up a rock—only half the size of the concrete chunk described by other witnesses—because he feared for his life.

On cross-examination, the prosecutor asked defendant whether Bustamante had been willing to take a day off of work "to come in here to fabricate a story to get [defendant] in trouble." Defendant said that he did not know.

Defendant also testified about his interaction with Brennan, again giving a different version of events. Defendant denied that he told Brennan that he had returned the stolen cash and gold; he also denied having said that, if anything was missing, Pool must have stolen it. To the contrary, defendant asserted that he had told officers—before being put in the patrol car—that the cash and jewelry were in his pockets. Nonetheless, defendant testified, the officers put him in the car without searching him at all.

Defendant agreed that "stuff" had fallen out of his pants while he was in the patrol car. However, he denied that he had put any cash between his buttocks; he maintained that it had been in his shorts pockets, and had fallen out, landing between his shorts and his pants. The prosecutor

asked defendant whether Brennan had "lied about the location of where he found that cash." The trial court overruled defendant's objection to the question and defendant testified that Brennan had been "wrong" about where he found the money. The prosecutor responded by asking whether Brennan had been "just absolutely 100 percent wrong about all that detailed information," and defendant reiterated that the money had not been between his buttocks.

In testifying about his interaction with Reynolds, defendant denied that he told Reynolds that he wanted medication because he was experiencing withdrawal symptoms. Rather, defendant explained, he told Reynolds that, if he ended up getting in trouble, he "would like to go to a drug rehab." Defendant also denied that he had told officers that he had planned to use the money he stole to buy more drugs.

In its rebuttal case, the state elicited evidence that defendant had not told Reynolds that he had picked up the bag because he was hungry. Nor had he told Reynolds that he had heard Pool say the word "pistol" or that he had thought that Pool had a gun. Defendant did not tell Reynolds that Bustamante had ground the fence post into his abdomen after hitting him in the head with it. Rather, defendant attributed scratches that were on his stomach to having fallen on a pile of concrete in the alley.

The jury found defendant guilty on all charges. The trial court merged the verdicts for UUW and menacing with the guilty verdict for first-degree robbery, and it entered judgment accordingly.

Defendant raises eight assignments of error on appeal, each corresponding to a particular question that the prosecutor asked defendant relating to whether other witnesses had lied when they testified to facts different from those that defendant described in his own testimony:

(1) "So Officer Brennan took the stand and absolutely lied about the location of where he found that cash"? Defendant objected that the question asked one witness (defendant) to comment on the credibility of another. The trial court overruled defendant's objection.

(2) "[Brennan] was just absolutely 100 percent wrong about all that detailed information"? Defendant did not object to the question.

(3) "So is it your contention that *** Pool is willing to take a day off work to come in here so that he can lie on the witness stand and get you in trouble?" The trial court overruled defendant's comment-on-credibility objection.

(4) "Is it your contention, based on what you're saying, that *** Pool was willing to come in here today, having no prior knowledge of you, at all, and lie on the witness stand about you threatening him with a firearm?" Defendant did not object to the question.

(5) "Is it also your proposition that *** Bustamante, who doesn't know Mr. Pool, doesn't know you, doesn't know the Scheps, that he's also willing to take a day off work to come in here to fabricate a story to get you in trouble?" Defendant did not object to the question.

(6) "This woman [Knepell] who reported she called 9-1-1, she didn't see a stick, at all, either, right?" Defendant objected "on the same basis," which he explained further at a sidebar for which he then requested a standing objection. The court overruled the objection.

(7) "And *** [Bustamante] also had no recollection of hitting you, at all. Is your memory of events more accurate than his? Is that what you're saying?" At that point, the trial court had granted defendant a standing objection.

(8) After recounting the Schepses' testimony that they had been sitting only a few feet away from the bag: "So [the Schepses are] just totally incorrect about where they were sitting at the table that they sit at every week for the last two years"? Again, at that point, the trial court had granted defendant a standing objection.

On appeal, defendant reiterates his contention that the prosecutor's questioning of defendant on cross-examination improperly sought to elicit "vouching" testimony, that is, testimony that commented on the credibility of another witness. Defendant relies on *State v. Isom*, 306 Or 587, 591, 761 P2d 524 (1988), in which the Supreme Court

emphasized that "'a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth.'" (Quoting *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983).) The *Isom* court stated that the general prohibition against asking one witness to comment on the credibility of another "applies to circumstances in which a prosecutor cross-examines a defendant in a criminal case by asking whether a law enforcement officer 'would *** be lying' if he described facts differently than the defendant had." *State v. Corkill*, 262 Or App 543, 549, 325 P3d 796, *rev den*, 355 Or 751 (2014) (quoting *Isom*, 306 Or at 590-91 (omission in *Corkill*)). Under *Isom*, defendant observes, that "type of cross-examination will not be tolerated in any court of this state." Defendant contends that the trial court's error in overruling his comment-on-credibility objections was not harmless because the case amounted to a credibility contest between defendant and the other witnesses. Defendant also asks us to address his second, fourth, and fifth assignments of error even though he did not object to the questions that those assignments challenge because, according to defendant, the trial court plainly erred by not intervening *sua sponte* when the prosecutor asked those questions.

In response, the state asks us not to address the unpreserved assignments of error. It contends that, under *Corkill*, plain-error review is not available. With respect to the other assignments of error, the state argues that "[a]ny harm resulting from the prosecutor's questions and defendant's answers was minimal and does not require reversal." The state asserts that neither the prosecutor's questions, nor the answers that defendant gave, vouched for the credibility of any witness other than defendant. Rather, the state contends, defendant's argument is that the questions and answers reflected negatively on his *own* credibility. Because the state's other evidence itself "substantially undermined defendant's credibility," the state concludes, "the court's error in admitting defendant's testimony was harmless."

We agree that defendant's unpreserved assignments of error cannot survive *Corkill*, which similarly involved an unpreserved argument that a trial court should have *sua sponte* intervened when a prosecutor asked the defendant on cross-examination "whether the police officer witnesses

were lying." 262 Or App at 544. In that case, we character-ized "true 'vouching' evidence" as "one witness's testimony that he or she believes that another witness is or is not cred-ible, which a party offers to bolster or undermine the verac-ity of that other witness." *Id.* at 552. "That kind of testimony impermissibly invades the jury's role as the sole judge of the credibility of another witness" and can "create[] a 'risk that the jury will not make its own credibility determination, which it is fully capable of doing, but will instead defer' to an expert's opinion on that point. *State v. Southard*, 347 Or 127, 141, 218 P3d 104 (2009)." *Id.* at 553 (some internal quotation marks, brackets, and citation omitted).

We distinguished questions that seek to elicit true vouching evidence from those that attempt to get one wit-ness "to acknowledge that, if his own testimony was true, [other witnesses] must be lying." *Id.* That latter type of question, we explained, is not designed "to bolster or under-mine a different witness's testimony, but instead is directed at undermining the credibility of the witness who is pres-ently on the stand." *Id.* Accordingly, such a question does not create the kind of risk involved in true vouching cases, *viz.*, "that jurors would rely on witnesses' opinions about the credibility of [another witness] to avoid their independent obligation to determine whether [that other witness's] alle-gations were truthful." *Id.*

In addressing the *Corkill* defendant's unpreserved argument, we observed that neither we nor the Supreme Court had ever held that a trial court has a *sua sponte* obli-gation in the type of situation presented by *Corkill* (and by this case). *Id.* For that reason, "and because it is not 'obvi-ous' that the concerns that form the basis for a trial court's duty to *sua sponte* exclude true vouching evidence extend to the kind of questioning" at issue in *Corkill*, we held that the trial court had not plainly erred "by not interrupting the prosecutor's cross-examination of [the] defendant." *Id.* at 553-54. That holding governs here, and we reject defen-dant's unpreserved claims of error.

We turn to defendant's preserved claims of error, in which he argues that the trial court erred by overruling the objections he made when the prosecutor asked defendant

whether other witnesses had lied. Defendant is correct. Under *Isom*, that kind of cross-examination "will not be tolerated." 306 Or at 592.[1] Thus, the trial court erred when it allowed the prosecutor to ask defendant, on cross-examination, whether the police officers and other state's witnesses had lied.

We must affirm a judgment, despite any error committed at trial, if we determine that there is "little likelihood that the particular error affected the verdict." *State v. Davis*, 336 Or 19, 32, 77 P3d 1111 (2003). That "harmless error" inquiry is informed by a variety of considerations, including "the nature of the error" and the "context" of that error. *Id.* at 32-33; *see also State v. Perkins*, 221 Or App 136, 143, 188 P3d 482 (2008) (discussing *Davis*).

We first consider the nature of the error. Here, as we have explained, the prosecutor's cross-examination of defendant was improper under *Isom* because it included

---

[1] The *Isom* court did not explain, beyond citing the general principle that one witness may not comment on the credibility of another, why that prohibition should apply to the type of questions that the prosecutor asked the defendant on cross-examination. As we explained in *Corkill*, the kind of question asked in *Isom*, in *Corkill*, and in this case—the quintessential "are the police officers lying" inquiry—does not seek to elicit "true vouching" evidence, like the evidence that the court had discussed in earlier cases that led up to *Isom* and which that opinion cites. *See State v. Milbradt*, 305 Or 621, 629-30, 756 P2d 620 (1988) (trial court erred by admitting a psychologist's testimony that the complainant in a rape case was "not deceptive, could not lie without being tripped up, and would not betray" the defendant); *State v. Middleton*, 294 Or 427, 438, 657 P2d 1215 (1983) (in the context of allowing an expert to describe "the reaction of the typical child victim of familial sexual abuse," also asserting that "a witness, expert or otherwise, may not give an opinion on whether he believes a witness is telling the truth"). Accordingly, it is not immediately apparent why the holdings in those earlier cases led the *Isom* court to announce that the kind of cross-examination at issue here "will not be tolerated." Moreover, that announcement was *dictum*, as the court reversed the *Isom* defendant's conviction on other grounds.

Nonetheless, the Supreme Court has never disavowed that emphatic statement in *Isom* and we will not disregard it. The *dictum* in *Isom* differs in character from Supreme Court *dictum* that we have declined to follow in other cases. In those cases, the *dictum* often consisted of an observation made in passing, it related to a topic that had not been at issue before the Supreme Court, or it disregarded contrary case law. Under those circumstances, we felt free not to follow the *dictum*. *See, e.g., Riverview Condo. Assn. v. Cypress Ventures (A150586)*, 266 Or App 574, 599-600, 339 P3d 447 (2014) (in explaining our decision not to follow *dictum*, stating that "we find it highly unlikely that the Supreme Court intended to implicitly disavow the reasoning in one of its own cases * * * and effectively overrule well established Court of Appeals precedent, by way of *dictum* in a footnote that does not acknowledge any of that case law").

questions asking defendant whether other witnesses had lied. But the harm often associated with "true vouching" inquiries is absent. By asking defendant the questions at issue here, the prosecutor did not seek to have defendant either bolster or undermine the other witnesses' credibility. In other words, the questions were not aimed at eliciting testimony that would create a risk that the jury would abandon its role in determining those other witnesses' credibility. Nor did defendant's answers to those questions comment in any meaningful way on the witnesses' credibility; at most, defendant once said that Brennan was "wrong" about defendant having secreted the stolen money between his buttocks. That is not the kind of vouching testimony that creates a risk that the jury will defer to a witness's credibility determinations instead of reaching its own conclusions about which witnesses are truthful.

We also consider the context in which the error occurred. As noted, the purpose of the prosecutor's questions was not to bolster or undermine other witnesses' testimony. To the contrary, the questions had a different, and permissible, purpose: to undermine *defendant's* credibility by emphasizing that his version of events was incompatible with that portrayed by the other witnesses. Although the prosecutor could not permissibly do that by asking defendant whether the other witnesses had lied, she could—and did—accomplish the same thing during closing argument, by walking through the witnesses' testimony, pointing out each instance in which defendant's version of events differed from other witnesses', and urging the jury to conclude that defendant "had lied in many areas of his testimony and that none, none of his testimony should be accepted by you folks."

Moreover, the jury had to have been aware of the dramatic inconsistencies between defendant's story and the other witnesses' testimony, even as it was delivered. The prosecutor's questions of defendant did no more than emphasize what already must have been clear to the jurors: that they had been presented with incompatible versions of what happened after defendant stole the bag. In some sense, then, the evidence that the prosecutor sought to elicit from defendant was cumulative of what the jury already had heard.

In light of the stark contrast between defendant's testimony and that delivered by other witnesses, the prosecutor's permissible emphasis on those inconsistencies during her closing argument, and the absence of the harm ordinarily associated with "true vouching" evidence, we conclude that there is little likelihood that the prosecutor's impermissible cross-examination of defendant affected the jury's verdict. In other words, the trial court's error in overruling defendant's "comment on credibility" objections was harmless.

Affirmed.