Argued and submitted May 4, conviction of aggravated murder of a witness reversed, convictions of felony murder, kidnapping and burglary affirmed, sentence vacated and remanded for further proceedings September 20, 1990

# STATE OF OREGON,
*Respondent,*

*v.*

# CORNELIUS LEAMONZA BROWN,
*Appellant.*

## (CC C87-12-36938; SC S35743)

800 P2d 259

John P. Daugirda, Deputy Public Defender, Salem, argued the cause for appellant. With him on the briefs was Sally L. Avera, Public Defender, Salem.

Brenda J Peterson, Assistant Attorney General, Salem, argued the cause for respondent. Diane S. Lefkow, Assistant Attorney General, Salem, filed the brief for respondent. With her on the brief were Dave Frohnmayer, Attorney General, Virginia L. Linder, Solicitor General, and Timothy A. Sylwester and Richard D. Wasserman, Assistant Attorneys General, Salem.

GRABER, J.

## GRABER, J.

A jury convicted defendant of aggravated murder of a witness, ORS 163.095(2)(a)(E),[1] felony murder, ORS 163.115(1)(b)(C) and (F),[2] burglary in the first degree, ORS 164.225,[3] and kidnapping in the first degree, ORS 163.235.[4] After the jury answered in the affirmative the three penalty phase questions put to it on the aggravated murder count, the

---

[1] ORS 163.095(2)(a)(E) provides:

" '[A]ggravated murder' means murder as defined in ORS 163.115 which is committed under, or accompanied by, any of the following circumstances:

"* * * * *

"(2)(a) The victim was one of the following and the murder was related to the performance of the victim's official duties in the justice system:

"* * * * *

"(E) A juror or witness in a criminal proceeding[.]"

[2] ORS 163.115(1)(b) provides in part:

"Except as provided in ORS 163.118 and 163.125, criminal homicide constitutes murder:

"* * * * *

"(b) When it is committed by a person, acting either alone or with one or more persons, who commits or attempts to commit any of the following crimes and in the course of and in furtherance of the crime the person is committing or attempting to commit, or during the immediate flight therefrom, the person, or another participant if there be any, causes the death of a person other than one of the participants:

"* * * * *

"(C) Burglary in the first degree as defined in ORS 164.225;

"* * * * *

"(F) Kidnapping in the first degree as defined in ORS 163.235[.]"

[3] ORS 164.225 provides in part:

"(1) A person commits the crime of burglary in the first degree if the person violates ORS 164.215 and the building is a dwelling, or if in effecting entry or while in a building or in immediate flight therefrom the person:

"(a) Is armed with a burglar's tool as defined in ORS 164.235 or a deadly weapon; or

"(b) Causes or attempts to cause physical injury to any person; or

"(c) Uses or threatens to use a dangerous weapon."

[4] ORS 163.235 provides in part:

"(1) A person commits the crime of kidnapping in the first degree if the person violates ORS 163.225 with any of the following purposes:

"(a) To compel any person to pay or deliver money or property as ransom; or

"(b) To hold the victim as a shield or hostage; or

"(c) To cause physical injury to the victim; or

"(d) To terrorize the victim or another person."

court entered a judgment of conviction and sentenced defendant to death under ORS 163.150(1)(a) (1987).[5] The case is before us on automatic and direct review. ORS 163.150(1)(f) (1987). Defendant asks us to reverse his convictions or, in the alternative on the aggravated murder count, to vacate the sentence of death. We reverse defendant's conviction of aggravated murder of a witness, remand with instructions, and affirm his convictions of felony murder, burglary, and kidnapping.

Because the jury found defendant guilty, we view the evidence in the light most favorable to the state. *State v. King,* 307 Or 332, 339, 768 P2d 391 (1989). On November 30, 1987, Hope Anderson disappeared. She and defendant had been involved in a romantic relationship for about four years. Their relationship deteriorated markedly during 1987; defendant repeatedly threatened and beat her. Sometime in 1987, defendant told a friend that he intended to have someone kill Anderson, wrap her in chains, and throw her body into the river.

In September 1987, police interviewed Anderson and her daughter about the daughter's allegations that defendant had raped her several times while she was between 12 and 15 years old. The jury did not learn the details of those allegations at the guilt phase of the trial, however; testimony was limited to the fact that Anderson and her daughter were expected to be witnesses against defendant in an ongoing felony investigation. The investigation was awaiting presentation to the grand jury when Anderson disappeared.

Shortly after the interview about her daughter's allegations of rape, Anderson told police that defendant knew of the investigation and had threatened her. She gave them two grocery bags of prescription drugs and some documents, which she said were records of defendant's drug-dealing activities. Anderson asked that the evidence be used to put defendant in jail, so that she would feel safe. The police examined the

---

[5] Before its amendment in 1989, ORS 163.150(1)(a) provided in part:

"Upon a finding that the defendant is guilty of aggravated murder, the court * * * shall conduct a separate sentencing proceeding to determine whether the defendant shall be sentenced to life imprisonment or death."

Or Laws 1989, ch 790, § 135b, did not change that sentence in the statute.

evidence and gave it to defendant's probation officer. As a result, a hearing was scheduled to determine whether defendant's probation should be revoked. The hearing did not take place until after Anderson's disappearance.

The day after turning over the drugs to the police, Anderson filed for a restraining order against defendant. After a week, she had the restraining order vacated, because defendant had threatened to take away a young child for whom she had been caring since his birth. In the meantime, Anderson had reported to the police that defendant had appeared at her home, that the restraining order was the only means that she had to keep defendant away from her, and that she feared for her life.

On October 17, 1987, defendant beat and injured Anderson. A neighbor took her to the hospital for treatment. The neighbor testified, without a hearsay objection, that Anderson said that defendant had threatened to kill her, because she was going to testify against him on either a drug or assault charge. On Monday, October 19, Anderson filed assault and menacing charges against defendant. He was arrested and arraigned the same day, and later he was released. The following day, Anderson obtained a second restraining order.

Defendant requested a jury trial on the assault and menacing charges. The court set the trial for December 4, 1987. Because of Anderson's disappearance, the state could not proceed, and the charges eventually were dismissed.

On November 8, 1987, Anderson reported to police that defendant had tried to force her to enter his car and had threatened to kill her if she ran away. On November 23, defendant contacted the police to report that Anderson was harassing employees at a restaurant that he owned. He said that, if the police did not do something about it, he would kill Anderson. Defendant filed a motion to modify Anderson's restraining order. The modification hearing was scheduled for the day on which Anderson disappeared.

On the evening of November 29, 1987, Anderson ate dinner at home with her children, her daughter's boyfriend, and her sister-in-law. Anderson had prevailed upon the sister-in-law to move in with her temporarily, because she feared

defendant. The sister-in-law's boyfriend also arrived later in the evening. All of these family members and friends stayed in the Anderson home on the night of November 29. Although Anderson routinely barricaded the back door to prevent defendant from entering the house with a key that he still had, she did not do so that night, because of a scarcity of keys and because of concerns about her guests' schedules.

At about 4 a.m. on November 30, a commotion awakened the people who were staying at Anderson's home, as well as some of the neighbors. One of Anderson's sons testified that he heard his mother screaming. He saw defendant outside his mother's bedroom and heard defendant threaten her in an angry voice. Defendant told Anderson to shut up or he would kill her. Then the son saw defendant take Anderson outside and push her into his car while holding her by the arm and hair. Defendant drove away.

Meanwhile, others were awakening. The sister-in-law heard Anderson say "no" several times. The sister-in-law's boyfriend saw defendant walking Anderson down the sidewalk toward the car; he had his arm locked through hers, and she was screaming. Anderson's daughter, who had run downstairs, saw defendant's car going down the street. She could see defendant hitting Anderson in the face as he drove. A neighbor heard screams and reported that defendant was on the street holding Anderson by the hair and arm. Defendant slapped her, knocking her to the ground, and said, "Shut your mouth, bitch." Another neighbor heard loud voices and saw a car that matched the description of defendant's.

Anderson has not been seen or heard from since the early morning of November 30, 1987. Her body has never been discovered.

A search of defendant's car, conducted shortly after Anderson's disappearance, revealed two light brown hairs with reddish-blonde dye lines, which were found in the trunk. The colors of the hairs and the location of the dye lines were consistent with Anderson's hair. There was a muddy spare tire on the floor of the passenger compartment, behind the driver's seat, but no spare tire in the trunk.

After his arrest, defendant shared a cell with Bates, who was being held on a burglary charge. Bates learned why

defendant was being detained when he read a newspaper account of Anderson's abduction. When another prisoner, in commenting about the article, asked defendant if he was still "messing with" Anderson, defendant replied that "she wasn't no trouble no more, you know, that, you know, [I] cut her loose." Defendant talked to Bates about whether searchers "would find what they're not supposed to" during a search of the Columbia River for two missing boaters. According to Bates, defendant later said that "he had put her in a place where * * * the gang had dumped some bodies there before and nobody ever found them so he really wasn't worried about it."

On appeal, defendant raises 16 assignments of error, of which 7 relate to the penalty phase of the trial. In addition, the state in its Respondent's Brief brought to light an additional issue. We turn first to the state's point and then to defendant's arguments.

## INSTRUCTION ON
## AGGRAVATED MURDER OF A WITNESS

Defendant was convicted of aggravated murder of a witness. ORS 163.095(2)(a)(E) (set out *ante* at note 1). In *State v. Maney,* 297 Or 620, 623, 688 P2d 63 (1984), this court noted that the statute "contains two independent requirements: The victim must fit into one of the designated categories and the murder must be 'related to the performance of the victim's official duties in the justice system.' "

> "The second element of ORS 163.095(2)(a), that the murder be 'related to' the victim's official duties in the justice system, focuses on the defendant's purpose for the murder. *It requires the state to prove a causal connection between the murder and the victim's status as a witness,* juror, police officer or other targeted category. If, for example, a person intentionally kills someone without knowledge that the victim was a member of one of the designated classes, or for a reason unrelated to that status, the requisite causal connection would not have been met and a charge of aggravated murder would not have been stated." 297 Or at 626 (emphasis added).

The trial judge gave this instruction on the elements of aggravated murder of a witness:

> "Let's move now to Instruction No. 13 which deals with aggravated murder. To establish this count, the State must prove that the act was committed in Multnomah County, on

or about the 30th day of November, 1987; that the Defendant intentionally caused the death of Hope Anderson; that Hope Anderson was to be a witness in a criminal proceeding."

Neither that instruction nor any of the others stated that there must be a causal link between the murder and the victim's status as a witness. Accordingly, the trial court erred. We must next determine whether defendant properly preserved that error below and presented it on appeal, and, if not, whether we should consider it nonetheless.

 The state had requested Uniform Criminal Jury Instruction No. 1303, which provides that the state must prove beyond a reasonable doubt that the victim was a witness in a criminal proceeding and that "the murder was related to the performance of [her] official duties in the justice system." That instruction is correct, because it tracks the statutory definition of the causation element of the crime.[6] Defendant had asked instead for an instruction that would have told the jury that the murder must have been committed "in order to prevent [the victim's] appearance as a witness in a criminal proceeding." Although that happened to be the main theory that the state developed in this case, defendant's formulation of the causation requirement is incorrect, because it unduly restricts the reason for the murder. As noted in *State v. Maney, supra:*

"The requisite relationship could be shown by proving that the defendant's purpose was either to prevent the victim's future testimony as a witness, to retaliate for the victim's past testimony as a witness, or for some other reason directly related to the victim's status as a witness in a criminal proceeding." 297 Or at 626.

Before closing arguments, the parties and the judge reviewed the written instructions that the court planned to submit to the jurors. Defendant did not object to the court's proposed Instruction No. 13, the instruction on aggravated

---

[6] The state's requested instruction also parallels Count 1 of the indictment, which reads in part:

"The said defendant, on or about November 30, 1987, in the County of Multnomah, State of Oregon, did unlawfully and intentionally cause the death of another human being, to-wit: Hope Anderson, a witness in a criminal proceeding, *said murder being related to the performance of Hope Anderson's official duties in the justice system * * *.*" (Emphasis added.)

murder of a witness. After the court instructed the jury, defendant excepted to Instruction No. 13, but only on the ground that there was no evidence to support the giving of the instruction. He did not except to the omission of causation. On appeal, he does not assign as error the giving of Instruction No. 13 or the failure to give his requested instruction.

Ordinarily, a party's failure to request a proper instruction precludes appellate relief for the trial court's refusal to give the instruction. *State v. Francis,* 284 Or 621, 626, 588 P2d 611 (1978). Similarly, a failure to except to the trial court's instruction on a specific theory generally bars appellate relief on that theory. ORCP 59H, made applicable to criminal cases by ORS 136.330(2); *Delaney v. Taco Time Int'l.,* 297 Or 10, 18, 681 P2d 114 (1984). Finally, a party must assign error in order to have the appellate courts consider the issue. ORAP 5.45(2). Defendant failed in all three particulars.

Before discussing the effect of those failures, we pause to commend the state for having brought this issue to the court's attention. By doing so, counsel have displayed the highest ethical standards of our profession.

ORAP 5.45(2) provides that "the appellate court may consider errors of law apparent on the face of the record," notwithstanding a defect in preservation at trial or presentation on appeal. We apply that rule here. First, as noted, the error is one "of law." "In charging the jury, the court shall state to them all matters of law necessary for their information in giving their verdict," ORCP 59B, made applicable to criminal cases by ORS 136.330(1); the court erred by not doing that. Second, the error is "apparent," which we interpret to mean that the legal point is obvious, not reasonably in dispute. The court generally must instruct on all essential elements of the crime charged. Third, the error appears "on the face of the record." We need not go outside the record or choose between competing inferences to find it, and the facts that comprise the error are irrefutable. Thus, we "may consider" the error.

We exercise our discretion to consider the issue for two reasons. In the circumstances, we find that the ends of justice will not otherwise be satisfied. *State v. Avent,* 209 Or 181, 183, 302 P2d 549 (1956). The court's complete failure to

instruct on causation may have led the jury to convict defendant without having found that the victim's status as a witness motivated the murder in any way. *State v. Hill,* 298 Or 270, 280, 692 P2d 100 (1984). The prejudice to defendant is profound, because the missing element makes the difference between life and death. *Cf. State v. Gowin,* 241 Or 544, 548, 407 P2d 631 (1965) (for instruction to constitute reversible error, it must have prejudiced the defendant when instructions are considered as a whole).

Moreover, in the somewhat unusual posture of this case, the purposes of the rule requiring preservation of error generally were served. The reasons for the rule in the trial court are to allow the adversary to present its position and to permit the court to understand and correct any error. *State v. Hitz,* 307 Or 183, 188, 766 P2d 373 (1988). Here, each party's proposed instruction contained a causation element, the trial court had a full opportunity to consider the proposed instructions, and neither party contends on appeal that causation was unnecessary. Similarly, the purpose of an assignment of error was satisfied. Because one of the parties fully briefed the matter and set out verbatim the pertinent parts of the record, this court on appeal need not search the record. ORAP 5.45(3).

The state contends that we ought not consider the error under ORAP 5.45(2), because the evidence and the arguments of counsel to the jury emphasized the causal link between defendant's knowledge that Anderson was to be a witness against him and his decision to kill her. However, neither the sufficiency of the evidence nor the completeness of counsel's arguments concerning that evidence is a substitute for the sufficiency of the instructions. As is usually the case, the trial court cautioned the jury that what the lawyers argue is not evidence and that it is the court's function to instruct the jury as to the law.

We hold that the trial court committed reversible error when it failed to instruct the jury on the causation element of aggravated murder of a witness.

In order to determine the appropriate disposition of the aggravated murder conviction, we must consider defendant's guilt-phase assignments of error, some of which would require reversal and preclude retrial, if well taken. Further,

the error in the aggravated murder instruction does not affect defendant's other convictions. Accordingly, we also consider the assignments of error that pertain to those convictions.

## ASSIGNMENT OF ERROR NUMBER I

■ In his first assignment of error, defendant challenges the admission of evidence, over his objections, "about defendant['s] possessing and dealing narcotics." He also challenges the denial of his related motions for mistrial.

The disputed evidence was testimony of Officer Winegar. He responded to a call from Anderson in late September 1987; she had asked the police to be present while she retrieved some of her property from a house in north Portland. Anderson gave Winegar two grocery sacks, which contained papers and prescription pill bottles. Winegar testified:

"Q. Did she say anything about that when she provided it to you?

"* * * * *

"A. Hope Anderson had told me that the, the property in the sacks were records given to her by Cornelius Brown and these records were of drug dealing activities. She said that they were given to her to keep by Cornelius Brown, and she asked me to use these against Cornelius Brown.

"* * * She asked me if I could arrest him based on what was in the sacks. * * *

"* * * * *

"She said she wanted me to use that information to put him in jail so that, she felt that was the only way she could be safe from Cornelius Brown was if he was in jail. So she asked me to use that property in there to put him in jail."

Defendant objected that Anderson's statements were hearsay, not covered by any exception.[7] The state's response was twofold: the statements were admissible under OEC

_____

[7] At trial, defendant also argued that the evidence was irrelevant. On appeal, however, he concedes that Anderson's fearful state of mind during the late fall of 1987 was relevant to prove that she did not accompany him voluntarily on the night of her disappearance.

803(3)[8] to show Anderson's state of mind, and they were not hearsay, because they were not offered to prove the truth of the matters asserted.[9] With respect to the second point, the state argued more specifically that it was offering the statements and other evidence from Winegar on the issue of defendant's motive to kill Anderson:

> "He was aware that he had been subpoenaed, or he had been ordered to appear in court on probation, allegations of probation violation, and that one of the allegations was that the Defendant was participating and continued to participate in drug dealing or drug paraphernalia or something that would have been in violation of his probation.
>
> "That information had been provided to the officer and to the probation officer by Hope Anderson, and that, along with several other things, are motives that the Defendant had for killing Hope Anderson."[10]

A statement of then-existing fear meets the test of OEC 803(3). Anderson's request for police action to arrest and jail defendant so that she could feel safe reflected fear and was, therefore, admissible under OEC 803(3).

■ Assuming, without deciding, that the remainder of the quoted testimony was inadmissible, defendant still cannot prevail. In stating his objections to the trial court, he did not segregate inadmissible portions of Anderson's statements from the admissible ones.

---

[8] OEC 803(3) provides:

"The following are not excluded by OEC 802, even though the declarant is available as a witness:

"* * * * *

"(3) A statement of the declarant's then existing state of mind, emotion, sensation or physical condition, such as intent, plan, motive, design, mental feeling, pain or bodily health, but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the execution, revocation, identification, or terms of the declarant's will."

[9] OEC 801(3) provides:

" 'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."

[10] There was other evidence that defendant learned about Anderson's visit to the police and about her anticipated appearance at the probation revocation hearing. For example, Anderson's affidavit in support of the second restraining order stated that defendant presented an "immediate and present danger of further abuse, because he is facing drug charge's [sic] because I turned him in."

"It is well established that when evidence is offered as a whole and an objection is made to the evidence as a whole and is overruled, the trial court will ordinarily not be reversed on appeal if any portion of the offered evidence was properly admissible, despite the fact that other portions would not have been admissible had proper objections been made to such portions of the offered evidence." *Sproul v. Fossi,* 274 Or 749, 755, 548 P2d 970 (1976) (citations omitted).

The same rule applies in criminal cases. *State v. Madison,* 290 Or 573, 580, 624 P2d 599 (1981) ("An objection to evidence as a whole is insufficient when any part of the evidence objected to is admissible"). *See also Brown v. J. C. Penney Co.,* 297 Or 695, 704-05, 688 P2d 811 (1984) (same rule applies to exhibits). Accordingly, the trial court did not err in overruling defendant's hearsay objection to Winegar's testimony about Anderson's statements.

■ Defendant also contests the admission of another part of Winegar's testimony:

"Q. What did you do with this information, Officer?

"* * * * *

"A. Okay. At that time, I looked through the sacks preliminarily to determine what kind of property I was seizing, and at a later time, I looked through the sacks thoroughly and determined what kind of information was there, the records that were included, the names, documents, and exactly what the labels were on the pill bottles, that kind of thing.

"Q. Did you then provide this information to the Defendant's probation officer?

"A. Yes, I did. I told the probation officer what I had found in there and what information I had received from, after talking to some of the doctors that were referred to in the information.

"Q. Were you ever subpoenaed, then, to appear at a probation violation, a probation violation hearing for the Defendant?

"A. Yes.

"* * * * *

"Q. And was that prior to the time of November 29th and November 30th of '87?

"* * * * *

"A. That's correct."

Defendant asserts that testimony about a probation officer and a probation revocation hearing injected evidence of a prior conviction. He argued to the trial court that evidence of another crime was inadmissible, because it would encourage the jury to "think that the Defendant is a bad man and convict him whether he's guilty of the crime charged or not." The state offered the evidence on the theory that it was relevant to prove defendant's motive for the murder. OEC 404(3).[11]

One of the state's theories of aggravated murder in this case was based on the fact that Anderson was to be a witness in defendant's probation revocation hearing. Defendant does not dispute that a probation revocation hearing is a criminal proceeding within the meaning of ORS 163.095(2)(a)(E). Winegar's testimony established that a probation revocation hearing was set before Anderson disappeared and that she had supplied incriminating evidence to be presented at the hearing. Thus, the challenged evidence tended to prove defendant's motive, which was a central issue.

In addition, defendant contends that the evidence was irrelevant,[12] because the revocation hearing took place after Anderson's disappearance, so that she did not actually testify as a "witness" and was not shown to be a "necessary witness." A victim need not have testified already to come within the statutory definition in ORS 163.095(2)(a)(E). *State v. Maney, supra,* 297 Or at 624-26. Neither does the statute require that the witness be "necessary." The evidence was relevant.

■ Defendant next argues that, even if all of the evidence was relevant and otherwise admissible, it was so inflammatory

---

[11] OEC 404(3) provides:

"Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident."

[12] OEC 401 provides:

" 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

that the trial court should have excluded it or, in the alternative, should have granted his motions for mistrial after admitting it. OEC 403.[13] The trial court admitted the evidence and later ruled:

"I think the evidence is prejudicial, but I think its probative value far outweighs the prejudicial effect. * * *

"I think it has relevancy on several issues: state of mind. It has relevancy on motive with regard to the allegation that Hope Anderson was to be a witness in a court proceeding.

"So your motion for mistrial will be overruled."

We review the decision to admit the evidence for an abuse of discretion. *State v. Moen,* 309 Or 45, 70, 786 P2d 111 (1990); *State v. Madison, supra,* 290 Or at 578-80. We review the denial of motions for mistrial under the same standard. *State v. Farrar,* 309 Or 132, 164, 786 P2d 161 (1990). Here, the trial court acted within the permissible range of its discretion. The court properly could decide that the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

Defendant makes several subsidiary arguments, but they require no discussion. Some were not preserved, and none is persuasive. The trial court did not err in admitting the evidence and in denying the motions for mistrial.

### ASSIGNMENT OF ERROR NUMBER II

During the state's direct examination, defendant's cellmate, Bates, testified:

"Q. Mr. Bates, do you know the Defendant in this case, Cornelius Brown?

"A. Yes.

"Q. How do you know Mr. Brown?

"A. Well, I've met Mr. Brown years ago, and I've, on occasion, had drug transactions with him."

---

[13] OEC 403 provides:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay or needless presentation of cumulative evidence."

Defendant does not argue that the evidence of other crimes failed other parts of the test for admissibility set out in *State v. Johns,* 301 Or 535, 725 P2d 312 (1986).

Defendant objected that evidence of another crime was "highly prejudicial" and denied his right to a fair trial. He asked that the testimony be stricken and that the jury be instructed to disregard it; he also moved for a mistrial. The court denied the motion but gave a cautionary instruction.

On appeal, defendant assigns as error the denial of his motion for mistrial. We review that ruling for an abuse of discretion. *State v. Farrar, supra,* 309 Or at 164.

Relying on *State v. Jones,* 279 Or 55, 566 P2d 867 (1977), defendant argues that some testimony is so prejudicial that its presence defies cure through a cautionary instruction. This is not such a case. In *Jones,* this court noted that there was repeated, deliberate prosecutorial misconduct, which created "pervasive" prejudice. For example, the "prosecuting attorney, well knowing that he had no proof that defendant has been previously convicted of rape * * *, persisted in making comments and insinuations to that effect [in a rape trial], including the clearly improper attempt to get before the jury the alleged statement by Ms. Mullins that he had 'done it so many times before.' " 279 Or at 63. Here, in contrast, there were few references to defendant's involvement with drugs in a prosecution for entirely different types of crimes.

> "While this court has held that the effect of prejudicial testimony can not always be cured by instructing the jury to disregard it, * * * it has also been said that the matter rests within the trial court's discretion, * * * and as a matter of practice a conviction will rarely be reversed if a curative instruction is given. This is true even in capital cases." *State v. Jackson,* 221 Or 315, 323-24, 351 P2d 439 (1960) (citations omitted).

*See also State v. Farrar, supra,* 309 Or at 162-64 (trial judge did not abuse discretion in denying mistrial for isolated, improper reference to lie detector test). Under the circumstances, the trial court did not abuse its discretion in denying defendant's motion for mistrial.

## ASSIGNMENT OF ERROR NUMBER III

Detective Findling was one of the officers assigned to investigate Anderson's disappearance. He learned that Bates, who was in custody, had relevant information. At trial, the

prosecutor questioned Findling about his interview with Bates. This exchange took place:

"Q. In this type of situation, in, particularly when you go in and interview someone incarcerated in some type of a facility who may have information, are you concerned about getting as accurate information as possible from an individual?

"A. Certainly.

"Q. What techniques do you use in interviewing someone such as Mr. Bates to insure that the information you get is accurate?

"A. Basically, my, I don't supply them with any information. I ask open-ended, very broad questions. For example, what can you tell me about what happened? What did this guy tell you?

"[DEFENSE COUNSEL]: Your Honor, these type of questions, I'll object to this line of questioning. The witness has already testified, and now the detective is attempting to corroborate his testimony, and I object.

"I think the witness' testimony is going to stand or fall by itself without his corroboration.

"THE COURT: Overruled.

"* * * * *

"[Q.] And how did you conduct your interview with Mr. Bates?

"A. In exactly that manner. I asked Mr. Bates questions: 'What can you tell me now about what happened? What did the person say next?

" 'How did he know that? What was told to him?'

"Q. You provide yourself at that interview with Mr. Bates with any information about your investigation into the disappearance of Hope Anderson?

"A. Did I tell him anything about our investigation? No, I did not.

"Q. In that initial interview with Mr. Bates, did he provide you with information relating to Cornelius Brown and his role in the disappearance of Hope Anderson?

"A. He did.

"Q. Again, going back to your general technique that you

use after you've got information from a witness in that situation, do you ever attempt to check through an independent source the accuracy of that information?

"A. Certainly. Generally, when I do an interview like that, I have investigated the case, and I'm aware of a lot of different facts that haven't become public knowledge purposely on our part to establish the fact that what someone is telling me is truthful.

"[DEFENSE COUNSEL]: Your Honor, may I have a continuing objection to this testimony?

"THE COURT: Yes, you may.

"[PROSECUTOR]: (Continuing) Detective, among —

"A. Perhaps I should finish. I didn't finish.

"Q. I'm sorry. Go ahead.

"A. And in that particular case, there was information that hadn't been released to the public, and Mr. Bates was able to tell me what I already was aware of, which led me to believe he was being truthful.

"Q. Okay. Among other things, did you get information from Mr. Bates that included a reference about —

"[DEFENSE COUNSEL]: Your Honor, the witness has now made a statement that led, leads him to believe the witness is truthful.

"THE COURT: Yes. Your point is well taken.

"Jurors, you have the sole responsibility to determine what testimony you will believe and what testimony you'll accept so you'll disregard this officer's testimony about his belief. That's your job; not his."

Defendant then moved for a mistrial. The court denied the motion.

On appeal, defendant makes two arguments. He first asserts that his objections to the questions should have been sustained, because the questions were an improper attempt to elicit the witness' opinion about whether he believed that Bates was telling the truth. *State v. Isom,* 306 Or 587, 591-92, 761 P2d 524 (1988); *State v. Middleton,* 294 Or 427, 438, 657 P2d 1215 (1983). Defendant's objections were correct, because the questions, albeit in different words, sought to show that Findling believed that Bates was credible. Nonetheless, the

error does not require reversal. OEC 103(1).[14] This court held in *State v. Milbradt,* 305 Or 621, 630, 756 P2d 620 (1988):

> "Although we do not hold that any form of instruction necessarily would have been sufficient, the instruction by the trial judge in this case was insufficient in that the judge failed to tell the jury to disregard totally the testimony of Dr. Farrenkopf. We suggest in the future that if counsel attempts to elicit similar testimony the trial judge, *sua sponte,* should summarily cut off the inquiry before a jury is contaminated by it."

In contrast, the judge in the present trial told the jury to "disregard this officer's testimony about his belief." That unequivocal instruction was sufficient to dispel the jury's possible contamination by Findling's testimony about his belief.

Defendant's second argument is that, even if the trial court properly overruled his objections, it should have granted his motion for mistrial. For the reasons just given, the trial court did not abuse its discretion in denying the motion for mistrial.

## ASSIGNMENT OF ERROR NUMBER IV

In this assignment of error, defendant complains of rulings at both the guilt and penalty phases: the trial court's refusal to exclude evidence during the guilt phase that Anderson and her daughter were witnesses in a felony investigation in which defendant was the suspect, and the denial of a related motion for mistrial; and the admission of evidence at the penalty phase that the felony was the alleged rape of Anderson's daughter.

With respect to the guilt phase, defendant stated at trial that he had not received a police report concerning the alleged rape. The trial court allowed defendant to retain an investigator and gave him one week to prepare. Later, the court ruled that the state had to "sanitize" the evidence by referring to the daughter only as a "witness" in a "felony investigation," not as a "victim" of "rape."

---

[14] OEC 103(1) provides in part:

"Evidential error is not presumed to be prejudicial. Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected * * *."

Defendant urges, first, that the state breached its duty to disclose information, for which the trial court should have imposed the sanction of excluding evidence. ORS 135.865.[15] Defense counsel told the trial court that he had not received a copy of the police report. The prosecutor represented to the court that he had provided the document to defense counsel and that he had given defense counsel his entire trial notebook to review and, if counsel wished, to copy.[16] After listening to the colloquy, the court said:

> "I believe you, [prosecutor]. That's compliance as I understand it.
>
> "* * * * *
>
> "Well, I'm not prepared to imply or suggest anything. There's been some royal screw-up here. I can't figure out what could have happened, how in a major case, experienced lawyers could let something like that occur."

We understand the court to have found, as a fact, that the prosecutor had given the police report to defense counsel. Because the record supports that finding, we are bound by it. *State v. Herbert,* 302 Or 237, 241, 729 P2d 547 (1986). The court's rulings that allowed defendant one week in which to hire an investigator and that "sanitized" the evidence were not sanctions for a discovery violation, but practical solutions to ameliorate the effects of a mistake. The factual predicate for defendant's argument, that there was a discovery violation, is missing.

▮ ▮ Apart from any discovery problem, defendant contends that the evidence about the felony investigation was irrelevant or, in the alternative, that its "inflammatory nature greatly outweighed its probative value." The testimony was relevant, because it tended to prove defendant's motive to kill Anderson and tended to disprove defendant's theory that Anderson permanently abandoned her daughter and other

---

[15] ORS 135.865 provides:

"Upon being apprised of any breach of the duty imposed by the provisions of ORS 135.805 to 135.873, the court may order the violating party to permit inspection of the material, or grant a continuance, or refuse to permit the witness to testify, or refuse to receive in evidence the material not disclosed, or enter such other order as it considers appropriate."

[16] The police report itself states that the police had discussed with defense counsel whether defendant would be willing to talk to the police about the allegations.

family members on November 30, 1987. The trial court took steps to diminish the prejudice that could arise. It limited the guilt-phase testimony to the use of the terms "witness" in a "felony investigation." Defendant argues that the jury is likely to have inferred that Anderson's daughter had accused him of rape simply because of the relationship among the three of them and the age of the daughter. We disagree. There is no basis in the record to conclude that the jury speculated that "witness" meant "victim" or that "felony" meant "rape." The court cautioned the jury that the evidence was relevant only to the issue of whether Anderson was a witness and that it was not otherwise to consider defendant's involvement as a suspect in another proceeding. In addition, the court instructed the jury not to decide the case on guesswork, conjecture, or speculation. The trial court did not abuse its discretion in admitting the "sanitized" evidence and in denying defendant's motion for mistrial.

Finally, defendant asserts that the court erred by not excluding the daughter's testimony, during the penalty phase, that defendant had raped her several times. Because we reverse defendant's conviction of aggravated murder, we need not reach that argument. See *post* at 374.

## ASSIGNMENT OF ERROR NUMBER V

Defendant challenges the sufficiency of the evidence to support his convictions on all four counts. We already have held that the trial court erred in instructing the jury on aggravated murder. If, however, the state presented insufficient evidence to permit a conviction of aggravated murder, then defendant would be entitled to a reversal of that conviction, rather than a remand for a new trial. *State v. Verdine,* 290 Or 553, 558, 624 P2d 580 (1981). For that reason, we review the sufficiency of the evidence with respect to all of the crimes, including aggravated murder. The standard of review is "whether, after viewing the evidence in the light most favorable to the state, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *State v. King, supra,* 307 Or at 339.

### A. *Aggravated Murder of a Witness*

Defendant asserts that the evidence of aggravated murder of a witness was deficient in two ways. "First, the state

failed to prove the *corpus delicti* of aggravated murder, because it did not produce adequate evidence that a death occurred and that the death resulted from a criminal agency. Second, the state failed to prove that defendant knew that Anderson was a witness in a criminal proceeding."

On the first point, defendant's contention boils down to an argument that the circumstantial evidence was insufficient to prove that a death occurred and that he was criminally responsible for it. *See State v. Lerch,* 296 Or 377, 394, 677 P2d 678 (1984) (defining *corpus delicti).* He does not contest the proposition that circumstantial evidence can suffice to prove the *corpus delicti, State v. Krummacher,* 269 Or 125, 139, 523 P2d 1009 (1974); he argues simply that it was not enough in this instance. We disagree.

The evidence was sufficient to permit the jury to find beyond a reasonable doubt that Anderson is dead. She disappeared abruptly after defendant abducted her from her home during the night. Since then, she has not contacted her children, parents, siblings, or friends, with whom she previously had communicated regularly. She left behind all of her personal possessions, including treasured items, and took no coat although it was late fall. She did not collect the welfare check that arrived for her the day after her disappearance. She had just brought her daughter home for the purpose of testifying against defendant in an upcoming grand jury hearing. Those facts were sufficient for the jury to find that Anderson is dead.

■ Moreover, the evidence was sufficient to permit the jury to find beyond a reasonable doubt that defendant killed Anderson. Several eyewitnesses saw defendant take her out of her home by force, shove her into his car, and drive away. She was screaming; he threatened to kill her if she did not "shut up." He had assaulted her on several earlier occasions, and there was testimony that he had stalked her and threatened her. He had told a friend and a police officer that he might kill Anderson. In jail, defendant told his cellmate that he had "cut * * * loose" a woman who had been "giving him trouble." He worried aloud that the police might "find what they're not supposed to" while searching the Columbia River for two people who had drowned, but then felt reassured, because bodies that gang members had dumped "there" had not been discovered. After his arrest, defendant described to the police

how easily he could have arranged Anderson's death or killed her himself. Finally, physical evidence tended to link him with the murder. For example, two strands of hair found in the trunk of defendant's car appeared to match Anderson's. The evidence that defendant murdered Anderson was sufficient.

 Next, defendant argues that there was insufficient evidence that the murder related to Anderson's status as a prospective witness in a criminal proceeding. In this portion of the argument, defendant raises two legal issues. First, he contends that the hearing to modify the restraining order, which was set for November 30, 1987, was not a "criminal proceeding" within the meaning of ORS 163.095(2)(a)(E). He is correct, but the point does not avail him. Nothing in the record suggests that evidence of the modification hearing was offered to prove the aggravating element or that the jury considered it in that connection. No one at trial referred to the modification hearing as a criminal proceeding. In argument, for example, the prosecutor referred to the November 30 hearing in only two ways. He mentioned it in explaining why there were extra people in Anderson's house on November 29, causing her to leave the back door unlocked. He also argued that Anderson's plan to appear at a hearing the next day made it unlikely for her to have left home voluntarily that night, which was defendant's theory. The prosecutor asked the jury to focus on Anderson's anticipated appearance on December 4 as the complaining witness in defendant's trial for assault and menacing, in deliberating on her status as a witness in a criminal proceeding. The trial judge properly instructed the jury that the state was required to prove Anderson's "status as a witness in a criminal proceeding," and defendant does not contest the adequacy of that part of the instructions.

Defendant also argues that *State v. Boots,* 308 Or 371, 780 P2d 725 (1989), requires reversal on the aggravated murder count.

> "Here, only one theory of aggravation was involved, namely: Anderson's 'witness in a criminal proceeding' status under ORS 163.095(2)(a)(E). However, the state presented evidence of three instances in which Anderson might be deemed a witness. Here, there existed a substantial possibility that the jury relied upon Anderson's status in the restraining order modification hearing — a civil matter. Because this reliance could lead to a false verdict and because there was no

special verdict form to assure unanimous agreement on a valid aggravating circumstance, a judgment of acquittal should have been granted."

As discussed above, we do not agree that "there existed a substantial possibility" that the jury decided that Anderson's intended appearance at the modification hearing was an aggravating element. The state did assert that there were three criminal proceedings in which Anderson was to be a witness: the grand jury investigation of a felony, defendant's assault trial, and his probation revocation hearing. Nonetheless, we need not reach defendant's argument. Even if he were correct, the remedy would not be reversal, but only a new trial on the aggravated murder count. As discussed below, at pp. 373-74, defendant will be entitled to that remedy in any event. If there is a new trial, this issue may or may not recur.

■ Finally, defendant urges that the state failed to produce enough evidence of several facts: that Anderson would be a grand jury witness in the felony investigation, that Anderson would be a witness in the assault trial, that defendant knew that Anderson would be a witness in the assault trial, and that he killed her because she would be a witness in the grand jury proceeding or in the assault trial. In each of those respects, however, the evidence was sufficient for the jury to find the disputed fact beyond a reasonable doubt.

## B. *Kidnapping in the First Degree*

■ Defendant contends that there was insufficient evidence of his identity as the person in Anderson's home on the night in question and that, even if he were there, there was insufficient proof that Anderson left the house unwillingly. Neither point is well taken. Eyewitnesses who knew defendant identified him as the person who took Anderson away and also identified the car as his. They testified that he used force to take her with him and that she was screaming as she went. In addition, there was evidence that she feared defendant and did not want to be in his presence. For example, she obtained two restraining orders to prevent defendant from contacting her, turned over evidence to the police in the hope that defendant would be kept away from her by being jailed on drug charges, and filed criminal charges against him for beating her. There was, therefore, enough evidence of identity and force.

## C. *Burglary in the First Degree*

In addition to repeating the contention that there was not enough evidence to prove his identity, defendant asserts that the state failed to prove a trespass. He argues that he paid the rent on the house that Anderson occupied and that he could not burglarize his own home. A rational trier of fact, however, could have disagreed with the premise of that argument. Anderson's daughter testified that defendant did not pay any rent for the house.

There also was plentiful evidence that Anderson did not give defendant permission to enter the house on the night of her disappearance. The restraining order of October 20, 1987, prohibited him from entering the residence. His effort to modify that order demonstrated his knowledge of its terms. Furthermore, Anderson habitually barricaded her door against defendant. Witnesses heard her scream when she discovered that defendant was present on the morning of November 30. The evidence of burglary was not deficient.

## D. *Felony Murder*

The remaining challenge incorporates arguments already made. First, defendant asserts that there was insufficient evidence that defendant was at Anderson's home on November 30. Second, he claims that there was insufficient evidence of Anderson's murder. Third, he contends that there was insufficient evidence to prove either of the underlying felonies. We disagree with all three points, for the reasons discussed above.

## ASSIGNMENT OF ERROR NUMBER VI

In this assignment, defendant argues that the trial court erred in not granting a mistrial for "prosecutorial forensic misconduct" in closing arguments to the jury. According to defendant, several comments, at least when viewed in combination, denied him a fair trial and required the reversal of all his convictions.

Defendant failed to object to any of the challenged comments. Neither did he seek a cautionary instruction or move for a mistrial. Consequently, he did not preserve any claim of error. It may well be that defendant made a tactical choice not to object. *See State v. Miranda,* 309 Or 121, 127-29,

786 P2d 155 (1990) (no error in admitting evidence, where defense may have elected for strategic reasons not to object to prosecutor's questions on cross-examination). Defense counsel responded in his own closing argument to the comments of which he now complains, arguing that they were desperate measures that showed the weakness of the state's case. We decline to consider this argument on appeal.

## ASSIGNMENTS OF ERROR
## NUMBERS VII AND VIII

██ ██ These assignments concern the instructions on the elements of kidnapping and burglary. Defendant requested these instructions, which the trial court refused to give:

> "The crime of kidnapping is not established if the alleged victim consents to being taken from one place to another by the defendant.
>
> "In determining whether or not the alleged victim has given consent, you may consider the prior circumstances surrounding Hope Anderson's alleged departure with the defendant and her own individual lifestyle. These may include, but are not limited to, evidence or lack thereof, of struggle, attire at the time of the alleged act, whether Hope Anderson took her purse with her, or other preparations ordinarily associated with non-compulsory departure.
>
> "* * * * *
>
> "The crime of burglary is not established unless the defendant entered or remained unlawfully in the dwelling at 7418 N. Portsmouth. Any entry or remaining therein is not unlawful if it was done with Hope Anderson's permission or if the defendant had some other authority to do so. In considering whether the defendant had such permission or authority to enter or remain, you may consider whether the defendant was given a key to the premises by Hope Anderson, whether the defendant's personal property and possessions were at the premises, the prior habits of Hope Anderson and the defendant with regard to his comings and goings, and whether the child for whom the defendant was caring was living therein."

In addition, defendant objected to the instruction that the court gave on burglary:

> "[B]urglary in the first degree. To establish this count, the State must prove that the act was committed in Multnomah County, on or about the 30th day of November, 1987; that the defendant *entered or remained unlawfully* in the dwelling

located at 7418 N. Portsmouth with the intent to commit the crimes of kidnapping or murder therein." (Emphasis added.)

Defendant complains that the court's instruction was insufficient to apprise the jury of the unlawful entry element of burglary. As given, however, the instruction did contain the element that defendant emphasizes.[17] The court did not err in giving it.

Defendant's next assertion is that his instructions were "more complete" than the court's and would have "assured a fairer verdict." The requested instructions would have told the jury how specific evidence related to a particular legal issue and thereby would have commented impermissibly on the evidence. ORCP 59E, made applicable to criminal cases by ORS 136.330(1); *see also State v. Story,* 208 Or 441, 447, 301 P2d 1043 (1956) (principle applied before enactment of Oregon Rules of Civil Procedure). The court did not err in refusing to give defendant's proposed instructions.

For the first time, on appeal, defendant adds that the trial court should have given the statutory definitions of "without consent," ORS 163.215(1), and of "to enter or remain unlawfully," ORS 164.205. Defendant may not be heard to complain of those omissions, because he did not request such instructions and did not except to the court's instructions on that ground. ORCP 59H, made applicable to criminal cases by ORS 136.330(2); *see also State v. Braley,* 224 Or 1, 18, 355 P2d 467 (1960) (principle applied before enactment of Oregon Rules of Civil Procedure).

## DISPOSITION OF
## AGGRAVATED MURDER COUNT

We now have considered all of the assignments of error that might bear on defendant's conviction of aggravated murder. None of them requires a reversal, as distinct from a remand for a new trial.

The state suggests that the appropriate remedy is to

---

[17] Defendant also argues on appeal that the instruction on kidnapping failed to explain the "nonconsensual taking" element of kidnapping. At trial, he did not except to that instruction, which required the jury to find that defendant took Anderson from one place to another "without consent or legal authority." Accordingly, we do not consider this argument. *Compare* pp. 353-57, above.

remand the case for the state "to choose whether to reduce the defendant's conviction and sentence to murder under ORS 163.115 or to retry the charge of aggravated murder." *State v. Boots, supra,* 308 Or at 381. We agree with that suggestion. There was sufficient evidence to sustain a conviction for murder. The instruction that the trial court gave on aggravated murder, although it omitted the key aggravating element, required the jury to find all the necessary elements of murder under ORS 163.115. Thus, it would be proper to reduce the conviction to one for murder under ORS 163.115 and to resentence defendant accordingly.

■ There also was sufficient evidence to prove aggravated murder, even though the court gave an erroneous instruction. Therefore, the state may retry the charge of aggravated murder of a witness. If a new jury finds defendant guilty of aggravated murder after the guilt phase of the trial, then there would be a new penalty phase trial as well, after which the trial court would resentence defendant as may be appropriate. If a new jury does not find defendant guilty of aggravated murder, then the trial court would resentence him accordingly at that time.

## ASSIGNMENTS OF ERROR
## NUMBERS IX THROUGH XV

The ninth through fifteenth assignments of error pertain to the death penalty. Several arguments concern the constitutionality of the statute, others challenge instructions given or refused, and some relate to particular evidence introduced and arguments made at the penalty phase of the trial. Some of the assignments of error are governed by prior decisions of this court. We need not decide the remainder. Many are unlikely to recur even if there is a retrial, and those that do can be considered in a later appeal, if defendant is convicted again. *State v. Pratt,* 309 Or 205, 217, 785 P2d 350 (1990).

## ASSIGNMENT OF ERROR NUMBER XVI

In his sixteenth and last assignment of error, defendant argues that his convictions of burglary in the first degree and kidnapping in the first degree should have merged into the conviction of felony murder. *See* ORS 161.067(1) (merger statute); *State v. Fish,* 282 Or 53, 577 P2d 500 (1978) (merger of felony murder and underlying felony before enactment of

present statute). Defendant did not raise that issue in the trial court. The state suggests that he might not have done so because of its concession, which the trial court accepted, that the conviction of felony murder merged, for the purpose of sentencing, into the conviction of aggravated murder of a witness.[18] Nonetheless, the state asserts that we should apply the usual rule requiring preservation of error and should decline to consider this assignment. The state also responds on the merits.

If the state elects to stand on a conviction of murder, then defendant may present to the trial court whatever merger arguments are appropriate in that context. The same opportunity will be available to defendant if the state proceeds to trial on the aggravated murder charge, irrespective of the outcome in the guilt or penalty phase of that trial.

Accordingly, the ordinary trial and appellate process will suffice for the framing and consideration of any merger contentions that defendant may have. The issue as framed in this appeal may or may not be the issue that is framed on remand, and we will not consider it here.

Conviction of aggravated murder of a witness reversed; convictions of felony murder, kidnapping, and burglary affirmed; sentence vacated; remanded for further proceedings.

---

[18] We have reversed defendant's conviction of aggravated murder of a witness. That being so, there is no longer a conviction into which the felony murder conviction can merge, for sentencing or otherwise. We express no opinion on the correctness of the state's concession or the trial court's ruling.