Submitted February 12, portion of judgment ordering father and mother to have no contact reversed and remanded; otherwise affirmed April 8, 2015

In the Matter of C. L. M.,
a Child.
DEPARTMENT OF HUMAN SERVICES,
*Petitioner-Respondent,*

*v.*

E. L. G.
and C. M. M., aka C. M. R.,
*Appellants.*

Lane County Circuit Court
14334J;
Petition Number 14334J01;
A157786

347 P3d 825

Peter Gartlan, Chief Defender, and Shannon Flowers, Deputy Public Defender, Office of Public Defense Services, filed the brief for appellant E. L. G. Megan L. Jacquot filed the brief for appellant C. M. M.

Ellen F. Rosenblum, Attorney General, Anna M. Joyce, Solicitor General, and Cecil A. Reniche-Smith, Senior Assistant Attorney General, filed the brief for respondent.

Before Nakamoto, Presiding Judge, and Egan, Judge, and Wilson, Senior Judge.

NAKAMOTO, P. J.

.

## NAKAMOTO, P. J.

Father and mother (collectively, parents) each appeal a juvenile court judgment asserting jurisdiction over their two-month old child, C, making him a ward of the court under ORS 419B.100(1)(c). On appeal, father and mother argue that the juvenile court erred in asserting jurisdiction over C because the Department of Human Services (DHS) failed to establish that father and mother's incestuous relationship posed a current risk of serious loss or injury to C. In an additional assignment of error, mother argues that the juvenile court also erred in ordering parents to have no contact with one another. Parents acknowledge that they did not preserve their jurisdictional argument below, but they contend that the error is plain and urge us to exercise our discretion to correct it. For the reasons below, we conclude that, even if the juvenile court committed plain error in asserting jurisdiction over C, we would not exercise our discretion to correct that error. However, we agree with mother that the juvenile court lacked authority to issue the no-contact order. Accordingly, we affirm the portion of the judgment related to jurisdiction over child, but reverse the portion of the judgment in which the court ordered that father and mother have no contact.

Mother is father's biological, adult daughter. At some point in time (it is not clear from the record when), father and mother began a sexual relationship with one another, which resulted in the birth of two children, Z, born in August 2013, and C, born in June 2014.[1] Mother and father's other child, Z, has significant medical issues, including medical issues that are likely due to the close genetic relationship of his biological parents. At the time of the jurisdictional hearing regarding C, the juvenile court had asserted jurisdiction over Z and had placed Z in foster care.

Due to mother's previous involvement with DHS, DHS considered mother's pregnancy with C to be "high-risk." DHS was alerted when mother gave birth to C at a hospital in Klamath Falls, and DHS learned that there was

---

[1] In addition to Z and C, mother has three other children, all of whom have been adopted. The record does not disclose who fathered those other children.

a preliminary positive test for methamphetamine.[2] Four days after C's birth, DHS filed a dependency petition alleging that C was within the jurisdiction of the court under ORS 419B.100(1)(c), because C's "circumstances and conditions * * * are such as to endanger his own welfare" based on allegations relating to both father and mother.[3]

In the original petition, DHS alleged that mother could not safely parent C because she (1) had mental health issues; (2) had substance abuse problems; (3) had a chaotic lifestyle and living instability; (4) did not understand the basic needs of C and lacked parenting skills necessary to safely parent C; (5) had limited cognitive abilities; (6) "has another child for whom she is not a parental resource and the conditions or circumstances that were the basis for the mother not having custody of that child, which include the following: mental health issues, substance abuse, and limited cognitive abilities, have not changed or been ameliorated"; and (7) her parental rights have been previously terminated to another child based on conditions and circumstances that have not changed or been ameliorated. The petition alleged that father was not able to safely parent C because of his (1) criminal behaviors, (2) mental health issues, and (3) chaotic lifestyle and living instability. The juvenile court entered a shelter care order the same day that the petition was filed, placing C in the temporary custody of DHS pending a jurisdictional hearing on the petition. At some point before the jurisdictional hearing, the police initiated a criminal investigation into father and mother's relationship.

Prior to the jurisdictional hearing, and in exchange for the dismissal of the other allegations against her in the petition, mother agreed to admit the allegation that she

[2] It was not clear from the testimony at trial whether it was C who tested positive for methamphetamine, or mother, or both. The caseworker stated only that, at the time mother gave birth to C, "there was preliminary positive for methamphetamine."

[3] Mother was married at the time that she conceived and gave birth to C. As a result, in the petition, her husband was listed as the "presumed father" and mother's father was listed as "putative father," though mother and her father had consistently acknowledged that mother's husband was not C's biological father. Mother's husband was summoned but failed to appear at the jurisdictional hearing and is not a party to this appeal. Accordingly, we refer to C's "putative father," *i.e.*, mother's father and C's biological father, as "father" throughout this opinion.

"has another child for whom she is not a parental resource and the conditions or circumstances that were the basis for the mother not having custody of that child, which include the following: mental health issues, substance abuse, and limited cognitive abilities, have not changed or been ameliorated and interfere with her ability to safely parent the child."

At the jurisdictional hearing, parents were present and represented by counsel. The court noted mother's admission and asked the parties how they would proceed with respect to the allegations against father. DHS told the court that it was amending the allegation regarding father's criminal behavior and dismissing the remaining two allegations. As a result, the only allegation against father was amended to read:

"[H.]   Father is involved in a sexually intimate relationship with his daughter, [mother], resulting in the birth of two children, including this child. The child's sibling suffers from significant medical issues, including a genetic disorder, which may also affect this child. The father has continued to maintain his relationship with the mother, despite a pending criminal investigation, which interferes with his ability to safely parent."

DHS told the court that father had indicated that he would not be contesting that allegation:

"We have agreed to—Father will stand silent and allow a default to the modified [allegation]—we have amended the language of [Allegation H]."

The court told DHS that it would "not accept no-contest pleas under any circumstances." Father's attorney confirmed that father would be remaining silent as to that allegation. DHS then called Galyon, the caseworker assigned to C's case, who was the only witness to testify at the hearing.

On direct examination, Galyon testified that mother and father admitted to DHS and to criminal investigators that they are in an intimate relationship with one another and that they have parented two children together, including C. She further testified that C's sibling, Z, has "extensive medical issues" and has had some genetic testing and that "there was some genetic doubling apparently due to the

parents being so closely genetically related[.]" Galyon stated that, because C's circumstances are very similar, she was concerned that C is "definitely at risk" of suffering from similar genetic issues. Galyon confirmed that father and mother were continuing to present as a couple. When asked if that was a safety risk to C, Galyon responded, without elaboration, "I believe it is." Neither father nor mother objected during DHS's direct examination of Galyon, nor did they perform any cross-examination of Galyon.

Following Galyon's testimony, the court announced that it found that DHS had met its burden with respect to the allegation against father and moved on to disposition. Father's attorney informed the court that father and mother had relocated to Klamath Falls "so they could have a home, first and foremost." The court told the parties:

"Well, I'm going to order that they not have contact with one another, so they're going to have to sort through that.

"* * * * *

"I think that's directly related to the basis of jurisdiction and safety threat that continues."

The court then made C a ward of the court and committed him to DHS for care, placement, and supervision, with a placement preference of foster care. The court summarized the services that parents were ordered to participate in, including psychological evaluations. The court then reiterated that it was ordering father and mother not to have contact with one another:

"And, again, I'm ordering no contact between the parents. I find it is actually directly related to the basis of jurisdiction. It certainly bears a rational relationship to the basis of jurisdiction and the circumstances that brought us here today."

Mother's attorney asked the court if parents could return together to Klamath Falls, and the court said:

"They can return together, but my expectation is that they're not—

"* * * * *

"—this is not going to continue."

The court then clarified the basis of its order:

> "I look at the incest statute at [ORS] 163.525, and the conduct, at least by a preponderance, is squarely within the confines of that statute, and now we have two children with likely extensive needs, and so that's going to be the basis for the Court's order."

The court then recessed, and the recording of the proceeding stopped. What is likely seconds later, the record begins again, with mother's attorney, mid-sentence, objecting to the order:

> "—to order them not to be sexually intimate, because that could be against the law. But I don't think the Court has the authority * * * to order them not to have any contact in the ordinary sense of the word."

The court did not change its decision with respect to the order and included the no-contact order in the judgment of jurisdiction and disposition.

## JURISDICTION

On appeal, parents contend that the trial court erred in asserting jurisdiction under ORS 419B.100(1)(c) because DHS failed to prove that, as a result of mother's and father's conditions, C was exposed to a current risk of serious loss or injury that was likely to be realized. Father and mother acknowledge that they did not preserve their arguments, but they contend that we should nonetheless review them as plain error.

In response, DHS argues that the juvenile court's assertion of jurisdiction was not clearly erroneous because there was some evidence in the record to support the juvenile court's implicit factual finding that C's welfare was at risk, based on mother's admission that her conditions and circumstances prevented her from safely parenting and based on the caseworker's testimony that the parents' relationship could pose a risk of harm to C. Alternatively, DHS argues that, even if the juvenile court erred in making that determination on a limited record, we should not reach parents' unpreserved challenge to the sufficiency of the evidence because they invited that error.

We conclude that, even if the error was plain, we would not exercise our discretion to correct it. Accordingly, we need not reach the merits of parents' argument regarding the sufficiency of the evidence or DHS's argument regarding invited error.

"Generally, an issue not preserved in the trial court will not be considered on appeal." *State v. Wyatt*, 331 Or 335, 341, 15 P3d 22 (2000). Nonetheless, when the asserted error is "an error of law apparent on the record," or "plain error," we may consider it. ORAP 5.45(1); *see State v. Brown*, 310 Or 347, 355, 800 P2d 259 (1990) (stating the conditions for plain error review). However, even if the asserted error qualifies as "plain error," we must determine whether to exercise our discretion to reach the error and correct it. *Ailes v. Portland Meadows, Inc.*, 312 Or 376, 382, 823 P2d 956 (1991).

A number of considerations guide our determination of whether to exercise our discretion to correct plain error, including:

> "the competing interests of the parties; the nature of the case; the gravity of the error; the ends of justice in the particular case; how the error came to the court's attention; and whether the policies behind the general rule requiring preservation of error have been served in the case in another way, *i.e.*, whether the trial court was, in some manner, presented with both sides of the issue and given an opportunity to correct any error."

*Ailes*, 312 Or at 382 n 6. Other factors include (1) whether, and to what extent the party encouraged the judge's choice; (2) the possibility that the party made a strategic choice not to object; and (3) the interest of the judicial system in avoiding unnecessary repetitive legal proceedings, as well as *its* interest in requiring preservation of error. *See State v. Fults*, 343 Or 515, 523, 173 P3d 822 (2007) (identifying additional considerations in deciding whether to exercise discretion, in context of a criminal case involving sentencing error).

Here, we conclude that the factors weighing in favor of correcting any jurisdictional error are outweighed by the factors that weigh in favor of not correcting such an error. The record indicates that parents' failure to object to the sufficiency of the evidence below was a strategic choice. The

original petition had alleged multiple allegations against both parents. Before the jurisdictional hearing, mother, in exchange for dismissal of the bulk of the allegations against her, agreed to admit to a single allegation. Similarly, at the beginning of the jurisdictional hearing, DHS indicated that it was moving to dismiss a number of the allegations against father, so that only a single, amended allegation remained, to which father agreed to "stand silent." Both parents were present at the jurisdictional hearing and represented by counsel, yet, during the hearing, neither parent objected to the testimony of DHS's sole witness, nor did they cross-examine that witness, or object to the sufficiency of the evidence presented. If parents had wanted to contest jurisdiction, the jurisdictional hearing was the time and place to do that. Instead, parents' behavior leading up to, and during, the hearing indicates a conscious decision on their part not to contest jurisdiction. Though we recognize that the state bears the burden of establishing jurisdiction regardless of what the parents do at the hearing, in a situation like this, where there is evidence that parents made a strategic choice not to contest jurisdiction and so informed DHS, we are reluctant to consider the alleged error that likely resulted from that strategic choice.

Another factor that weighs in favor of not exercising our discretion in this case is whether the juvenile court was given an opportunity to correct any error. As noted, both parents were present at the hearing and given an opportunity not only to cross-examine the DHS caseworker regarding the risk of harm to which she referred, but also to object to the foundation for her opinion. Furthermore, either parent could have argued that DHS had failed to put on sufficient evidence of harm to C. Instead, neither parent objected to the witness's testimony or to the court's assertion of jurisdiction based on that testimony. Had they done so, the court would have been apprised of their contention that DHS's evidence was insufficient to support jurisdiction, and, as a result, the court would have been given an opportunity to reconsider its ruling in light of parents' argument, potentially avoiding this appeal. For those reasons, we do not reach parents' unpreserved argument that the trial court erred in asserting jurisdiction.

## NO-CONTACT ORDER

Mother also assigns error to the juvenile court's no-contact order.[4] Mother argues that the trial court's order was too broad because, instead of merely ordering parents to have no sexual contact, which mother concedes the court could have ordered, the court ordered that they have no contact whatsoever.[5] In response, DHS argues that the court could have concluded, based on the record, that, "if parents maintained *any* contact, they would continue to engage in the conduct that led to the court's intervention in their familial relationship in the first place," thus justifying the court's broad order that the parents not have any contact. (Emphasis in original.) We agree with mother that, given the bases for jurisdiction, namely, that parents' sexual relationship posed a risk of harm to C, the court's order that parents have no contact was overly broad.

As noted above, the court asserted jurisdiction over C based, in part, on the fact that father was involved in a sexual relationship with his daughter (mother in this case), that that relationship had resulted in the birth of two children, one of whom suffers from significant medical issues, including a genetic disorder, which may also affect C, and that father continued his relationship with mother despite a pending criminal investigation. Implicit in the court's assertion of jurisdiction was a determination that those conditions or circumstances posed a risk of harm to C. The court, citing the incest statute, ordered that parents have no contact with one another and found that the no-contact order was "directly related" to the basis of jurisdiction and that it bore "a rational relationship to the basis of jurisdiction." The problem with the court's order is that the basis for jurisdiction upon which the court relied in issuing the order was that parents' *sexual* relationship posed a risk of harm to C. Given the bases for jurisdiction, the court's order was overbroad, and the court lacked authority to order parents to have no contact.[6] Because mother concedes that the trial

---

[4] Father does not challenge the no-contact order on appeal.

[5] Mother also argues that the no-contact order interferes with father and mother's constitutional right to free association. We agree with DHS that that argument was not preserved below and, therefore, do not consider it on appeal.

[6] Following the submission of this case, DHS filed a notice of probable mootness on March 10, 2014. In its notice, DHS explained that, in January, father was

court could order mother and father to have no sexual contact, we need not reach the question of whether the court could issue such an order.

Portion of judgment ordering father and mother to have no contact reversed and remanded; otherwise affirmed.

---

convicted of incest and sentenced to 18 months' probation. As a special condition of that probation, the sentencing court ordered father to have no contact of any kind with mother. DHS argues that the imposition of that probation condition renders mother's assignment of error as to the juvenile court's no-contact order moot. Specifically, DHS contends that, because father has been ordered as a condition of his probation to have no contact of any kind with mother, the juvenile court's no-contact order has no practical effect on the rights of the parties. *See Homestyle Direct, LLC v. DHS*, 354 Or 253, 260, 311 P3d 487 (2013) ("A justiciable, nonmoot case is one in which the parties to the controversy * * * have adverse legal interests and the court's decision in the matter [will] have some practical effect on the rights of the parties." (Internal quotation marks omitted; brackets and ellipses in original.)). We disagree. At this point, it is possible that the dependency case involving C will outlive father's probationary period. In the event that it does, leaving the juvenile court's overbroad order in place will affect the rights of the parties.